**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

Silverboys, LLC

        Plaintiff,

v.

Sofia Joelsson, SoJo Design, LLC, Chayanne
Xavier Coe, Cudesso, LLC, Sofia Joelsson
Design, LLC, Joelsson Enterprise Managers,
LLC, Sofia Joelsson Enterprises, LLC, Limited
Edition, LLC, SoJo Living, LLC; Limited
Edition Curation, LLC, Design Ops, Inc., Spa
Ricci, LLC, 4TEEN7TY, LLC, Total Windows,
Inc., Bon Vivant Custom Woodworking, Inc.,
Fine Surfaces and More, Inc., and Visser
Closets, Inc.

        Defendants.

## COMPLAINT

Silverboys, LLC ("Plaintiff" or "Silverboys"), by and through its undersigned counsel, files

this Complaint against Defendants Sofia Joelsson ("Joelsson"); SoJo Design, LLC ("SOJO");

Chayanne Xavier Coe ("Coe"); Cudesso, LLC ("Cudesso"); Sofia Joelsson Design, LLC

("Joelsson Design"); Joelsson Enterprise Managers, LLC ("Joelsson Managers"); Sofia Joelsson

Enterprises, LLC ("Joelsson Enterprises"); Limited Edition, LLC ("Limited Edition"); Limited

Edition Curation, LLC ("Limited Addition Curation"); Design Ops, Inc. ("Design Ops"); Spa

Ricci, LLC ("Spa Ricci"); 4TEEN7TY,LLC ("4TEEN7TY"); Total Window, Inc. ("Total

Window"); Bon Vivant Custom Woodworking, Inc. ("Bon Vivant"); Total Window, Inc. ("Total

Window"); Fine Surfaces and More, Inc. ("Fine Surfaces"); and Visser Closets, Inc. ("Visser");

collectively, the "Defendants."

## PRELIMINARY STATEMENT

1.      This action is brought pursuant to the Racketeer Influenced Corrupt Organization

Act ("RICO") (19 U.S.C. § 1961, *et seq*.) and arises from the Defendants' illegal operation of an

interior design and construction consulting enterprise which has bilked Silverboys and others out

of millions of dollars over a more than decades long period.  Additionally, Silverboys asserts

claims for common law fraud, aiding and abetting common law fraud, breach of fiduciary duty,

aiding and abetting breach of fiduciary duty, civil conspiracy, breach of contract, conversion,

violation of Florida's Deceptive and Unfair Trade Practices Act, successor liability and an

accounting.

2.      Joelsson, a former Miss Sweden and the self-proclaimed "Penthouse Queen" of

South Beach, is a world-renowned interior designer based in Miami, Florida, with extensive

experience managing high-end residential interior design projects through the company she

controls, SOJO.  Joelsson and SOJO have been bankrolled for decades by a Hollywood movie

producer and oil magnate who met Joelsson in 1997.  On November 6, 2014, Silverboys

approached Joelsson to provide interior design services on the home it owns on Paradise Island,

Bahamas (the "Property").  In addition to providing interior design services for the Property (the

"Paradise Island Project"), Joelsson agreed to act as an expert for Silverboys in connection with

assessing the scope and resulting damages of the fraud committed against Silverboys by team of

contractors and designers who were previously working on the Property.  Joelsson presented herself as an empathetic partner who was uniquely situated to help Silverboys, as she claimed that she, too, had been the victim of fraud perpetrated by her former bookkeeper from 2005 through 2012, who she claimed sole her clients and her personal money.

3.      SOJO became the sole purchasing agent for the Paradise Island Project and oversaw all aspects interior design elements.  Joelsson was SOJO: she ran and directed every facet of its operations.  SOJO and Joelsson's trusted role as purchasing agent mandated that they exercise the utmost honesty in negotiating with all vendors on behalf of Silverboys and they promised to complete the Paradise Island Project in a safe, cost effective and expeditious manner.  Further, Silverboys only agreed to engage Joelsson as an expert witness against its former contractor and interior designer because she claimed to be honest, licensed and qualified, all of which would be called into question in a legal proceeding.

4.      Unbeknownst to Silverboys, Joelsson was totally unqualified.  She held herself out to be a fully qualified and licensed interior designer, but that was false, and she knew it, given that she had been repeatedly fined for misrepresenting SOJO's interior design license status.  At the outset of her engagement Joelsson began stealing from Silverboys using the enterprise she had assembled using SOJO, a network of shell companies – most of which have been run out of Headington's ritzy retail spaces rent-free since 2001 – and a team of preferred vendors, to defraud clients, evade federal and state taxes, circumvent immigration law, launder money and commit outright theft.

5.      The enterprise engaged in an elaborate yet well-orchestrated scheme that in fact mirrored the same frauds SOJO's former bookkeeper was imprisoned for.  Joelsson would prepare proposals for clients set at a predetermined amount supported by fraudulent quotes and contracts

from "pay to play" vendors.   Joelsson would then use the ill-gotten funds she received in satisfaction of the proposals to either launder into the purchase of real estate – at a price that was also predetermined and accounted for in client proposals – or to pay to "bundle" the quotes she had instructed her vendors to inflate so that she would be able to collect her secret commission. To keep up with the scheme, Joelsson and SOJO maintained multiple sets of records for the same transaction, one set to be presented to Silverboys and other victims if they should question any items, and another to keep track of the secret kickbacks and other fraudulent deals with the "pay to play" vendors.   Joelsson and her co-conspirators also prepared fraudulent sales tax records in furtherance of their scheme, defrauding both the United States and Bahamian authorities.

6.      To join the enterprise, the participants must agree to inflate their invoices so as to enable Joelsson and her affiliated entities to collect fees the inflated costs. They must agree to pay Joelssen kickbacks or referral fees, what SOJO employees refer to as "fruit-baskets," in the form of cash, goods or merchandise credit.   Those who agree to play are rewarded with continued business and placed on a Joelsson approved list of vendors.  And those who refuse were blacklisted in the industry.

7.      Defendants, through their conduct of the enterprise, have not only stolen millions from Silverboys and their victims but have endangered the welfare and physical safety of  their clients' families and children, all to achieve their one goal: utilizing their criminal enterprise to maximize their own gain at their clients' expense.  This enterprise is still in operation and still preying on new victims and has now extended out of Joelsson's base in Florida to the Bahamas. It will continue until it is stopped by the legal system.

8.      For the reasons explained in detail below, Silverboys seeks monetary damages in an amount to be determined at trial, but in any event not less than $7,000,000, to be trebled as provided by law, plus attorneys fees.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under RICO.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state law claims as they arise out of the same case or controversy.

10.     Defendants are subject to personal jurisdiction in this District as they reside in, have transacted and continue to transact business in, or have had more than minimum contacts with Florida in connection with the acts and transactions alleged herein.

11.     Venue is appropriate in this district pursuant to 28 USC § 1391(b), because the events giving rise to these claims occurred in this district.

## THE PARTIES

12.     Silverboys is a Delaware Limited Liability Company managed by Henry and Karen Silverman with its principal place of business in New York, New York.  Silverboys was created to purchase, build, renovate, furnish and decorate the Property.

13.     Defendant Sofia Joelsson is a Swedish citizen and resident of Miami-Dade County, Florida.  She is the owner and public face of SOJO, which she manages and controls alongside a number of shell entities relevant to this action, including but not limited to Cudesso, Joelsson Design, Joelsson Managers, and Joelsson Enterprises.

14.     Defendant SoJo Design, LLC (SOJO) is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County,

Florida.  SOJO is owned and controlled by Joelsson, and directly contracted with Plaintiff to provide services in connection with the Paradise Island Project.

15.     Defendant Chayanne Xavier Coe is a resident of Miami-Dade County, Florida and an employee of SOJO.  Coe was responsible for SOJO's business development and accounting, and worked under the direction or control of Joelsson.  Coe actively participated in, and knowingly assisted, the fraudulent scheme to defraud Plaintiff.

16.     Defendants Joelsson, SOJO, and Coe are collectively referred to herein as the "SOJO Defendants."

17.     Defendant Cudesso, LLC d/b/a Curated Living is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Miami-Dade County, Florida.  Cudesso is a shell company secretly owned and controlled by Joelsson. Joelsson purported to purchase items for the Paradise Island Project from Cudesso as if it were a legitimate, independent vendor. In fact, Cudesso was just a vehicle which purchased items from vendors at cheap prices which were concealed from Silverboys and then flipped the items to Silverboys at grossly inflated prices. Cudesso was also used as a conduit to funnel Silverboys' and other victims' money.

18.     Defendant Joelsson Design is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Joelsson Design in an attempt to shield those assets from creditors such as Silverboys.

19.     Defendant Joelsson Managers is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  It

is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Joelsson Managers in an attempt to shield those assets from creditors such as Silverboys.

20.    Defendant Joelsson Enterprises is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Joelsson Enterprises in an attempt to shield those assets from creditors such as Silverboys.

21.    Defendant Limited Edition is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Limited Edition in an attempt to shield those assets from creditors such as Silverboys.

22.    Defendant Limited Edition Curation is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida. It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Limited Edition Curation in an attempt to shield those assets from creditors such as Silverboys.

23.    Defendant Design Ops is incorporated under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Design Ops in an attempt to shield those assets from creditors such as Silverboys.

24.     Defendant Spa Ricci, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.  It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to Spa Ricci in an attempt to shield those assets from being pursued by creditors such as Silverboys.

25.     Defendant 4TEEN7TY, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.  It is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have fraudulently transferred assets to 4TEEN7TY in an attempt to shield those assets from creditors such as Silverboys.

26.     Defendants Joelsson Design, Joelsson Enterprises, Joelsson Managers, Limited Edition, Limited Edition Curation, Design Ops, Spa Ricci, and 4TEEN7TY are collectively referred to herein as the "Successor Defendants."

27.     Defendant Robert Whittingham ("Whittingham") is an architect licensed in the Bahamas and whose pervasive and fraudulent  actions in and directed to Florida form the basis for Silverboys' allegations against him.  Specifically, in numerous phone calls and emails to SOJO in Miami-Dade County, Florida, upon information and belief, conspired with SOJO to defraud Silverboys in connection with the Bahamas Project.  In so doing, Whittingham committed torts in Miami-Dade County, Florida.   Jurisdiction over Whittingham is therefore proper under § 48.193(1)(A)(2), Fla. Stat.

28.     Defendant Core Construction is a Bahamian company engaged as a subcontractor by Defendant Whittingham, whose pervasive and fraudulent actions in and directed to Florida form the basis for Silverboys' allegations against him. Specifically, in numerous phone calls and emails to SOJO in Miami-Dade County, Florida, upon information and belief, conspired with SOJO to defraud Silverboys in connection with the Bahamas Project.  In so doing, Whittingham committed

torts in Miami-Dade County, Florida.  Jurisdiction over Whittingham is therefore proper under § 48.193(1)(A)(2), Fla. Stat.

29.     Defendant Alex Reed is the head of Core Construction whose pervasive and fraudulent actions in and directed to Florida form the basis for Silverboys' allegations against him. Specifically, in numerous phone calls and emails to SOJO in Miami-Dade County, Florida, upon information and belief, conspired with SOJO to defraud Silverboys in connection with the Bahamas Project.  In so doing, Whittingham committed torts in Miami-Dade County, Florida. Jurisdiction over Whittingham is therefore proper under § 48.193(1)(A)(2), Fla. Stat.

30.     Defendant Bon Vivant is incorporated under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Bon Vivant is an independent vendor which was responsible for supplying and installing wooden millwork building components in the houses as a part of the Paradise Island Project.

31.     Defendant Total Window is incorporated under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Total Window is an independent vendor which was responsible for supplying and installing all custom window treatments for the houses as a part of the Paradise Island Project.

32.     Defendant Fine Surfaces and More, Inc. is incorporated under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Fine Surfaces is an independent vendor which was responsible for supplying and installing slabs of marble which were used in the construction of custom-built furniture for the houses as a part of the Paradise Island Project.

33.     Defendant Visser is incorporated under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Visser is an independent vendor which was responsible for installing closets in the houses as a part of the Paradise Island Project.

34.     Defendants Bon Vivant, Total Window, Fine Surfaces, and Visser are collectively referred to herein as the "Vendor Defendants."

35.     All conditions precedent to the filing of this lawsuit, if any, have been performed, excused, or waived.

### FACTS COMMON TO ALL CAUSES OF ACTION

**I.      Joelsson,  Her Controlled  Entities and Her Billionaire Backer and Enabler**

36.     Joelsson ascended to her "Penthouse Queen" status as a result of living in Headington's penthouses since 2008.  Headington not only provides Joelsson with the finances needed for her operations to date but also provides a critical platform to attract high-end clientele. Joelsson uses glamorous real estate properties owned by Headington's company, Headington Realty and Capital, to advertise her design enterprise  in design magazines, industry publications, and social media outlets that market to the affluent.  This illusion of wealth provides Joelsson with a false air of credibility, trustworthiness and competence.

37.     Once Joelsson had access to the high-profile clientele that Headington provided her with, she was then able to claim on her US E16 visa application that she had an "extraordinary" ability for interior design, despite the fact she had neither a relevant degree nor qualifications. Headington also falsely claimed, in order to promote her application, that he was the sole manager of SOJO and was directing day to day operations and supervising Joelsson.  Since then, Headington has financially supported Joelsson, SOJO and the Successor Entities.

38.     60.     Before the fraudulent scheme was directed at Silverboys, SOJO's former bookkeeper, Maximo Caggiano ("Caggiano"), engaged in a scheme from 2005 through 2012, ostensibly to defraud SOJO's then clients by issuing fraudulent invoices, overcharging clients, creating shell corporations, diverting goods and arranging complex financial transactions to disguise the wrongful requests and receipt of money.  Joelsson would employ a similar strategy in the enterprise directed at Silverboys.

39.     Further, unbeknownst to Silverboys prior to engaging SOJO's services, SOJO was cited and fined for falsely representing and marketing themselves as a licensed interior designer/interior design company twice in 2003, and again in 2004, 2007, 2010 and 2013.  Joelsson continued making this fraudulent misrepresentation to the unsuspecting Silverboys from November 2014 through April 2016.  Joelsson herself was personally cited by the IRS in 2010 for issues relating to tax evasion

## II.     Silverboys is Introduced to Joelsson

40.     Silverboys initially retained an interior designer (the "Original Designer"), architect Yianni Skordas ("Skordas"), and general contractor Michael Jones ("Jones") owner of Inline Construction, (all collectively known as "Original Team"), to undertake and complete the Paradise Island Project.  This trio abused their positions to defraud Silverboys and steal its property, launder money, and transport illicit goods, commit sales tax fraud, wire fraud and extort Silverboys by locking up its property.  As a result of these frauds and extortion, the trio was terminated and resulting arbitration and other legal proceedings confirmed the fraud and exposed the premeditated inducement of execution of the signature.

41.     Upon termination of the Original Team, Silverboys initiated a search for a new interior designer, and on November 4, 2014, was introduced to Joelsson by a trusted friend and

11

colleague.  Ten days later, Joelsson flew to New York to meet with one of Silverboys' principals, Karen Silverman, to review the status of the Paradise Island Project and assess what still needed to be done.

42.     Ms. Silverman discussed the pending legal action against the Original Team with Joelsson, who then agreed to act as an expert witness on behalf of Silverboys in its legal dispute with the Original Designer.  She also undertook a review the work to date on the Paradise Island Project to help her understand her role and scope of work going forward and to better understand how the Original Team had defrauded Silverboys.

43.     Ms. Silverman spoke with Joelsson several times over the phone and at in-person meetings in November 2014.  During those conversations, Joelsson explained to Ms. Silverman that she understood what it was like to be defrauded because she too had supposedly been a victim of fraud at the hands of her former bookkeeper, Maximo Caggiano.  Joelsson repeatedly emphasized how bad she felt about what the Silverman family was going through, and promised Ms. Silverman that SOJO took fraud seriously and had systems in place to protect against it, including a state-of-the-art computer program known as Design Manager.  Ironically, the very fraud perpetrated by Joelsson on Silverboys was was indeed identical to the multi-million-dollar fraud her bookkeeper had committed from 2005 through 2012 many years, supposedly without Joelsson's knowledge.

44.     Even more, Joelsson received a settlement payment of approximately $2 million from Regents Bank in connection with Caggiano's fraud.  Joelsson never told Silverboys about the settlement despite the fact that she received the payment on or about November 6, 2014, the very same week of her first meeting with Ms. Silverman.

**III.     <u>Silverboys Engages Joelsson and SOJO</u>**

45.     Joelsson was provided with access to all of the Original Team's papers, including all of the drawings, architectural plans, quotes from the Original Designer, bids from construction subcontractors, credits from mirrors and appliances that Skordas had stolen, inventory lists of items that were held hostage in the Original Designer's warehouse, and lists of all of the items that had been ordered or remained to be ordered.  These papers detailed all of the pricing from the Original Team and quotes that were needed to complete the Paradise Island Project.

### A.  The Engagement Agreement and Interior Design Contract

46.     On or about November 18, 2014, Silverboys and SOJO entered into a written contract ( the "Engagement Agreement ") pursuant to which Joelsson was to provide interior design services, including acting as the purchasing agent for Silverboys.  Among other things, the Engagement Agreement provided with respect to non-custom goods: "To ensure that we provide the best price possible to you, for non-customizable pieces, we research a fair market value based upon an internet search to find the three lowest prices that [Silverboys] would be able to purchase the item for.  Or, if these cannot be found, we will inquire into the manufacturer's suggested retail price.  This will become your price and is inclusive of our purchasing fee."

47.     Following entry into the Engagement Agreement Joelsson flew down to the Bahamas during the third week of November 2014 and did an initial walk through with Blue Point Construction ("Blue Point"), the project management firm that was brought on by Silverboys to assess the status of the project from both a constructive and financial perspective after Skordas' termination, as well as with the Jones (whose role in the prior fraud had not yet been discovered). Joelsson took notes on the items and materials that were already available onsite, including expensive plumbing, hardware, and tiles.

13

48.     Within days after the initial walk through, Joelsson sent a proposed Interior Design Contract to Silverboys wherein she would take on the role of purchasing a.  In light of its troubles with the Original Designer, Silverboys revised the proposed contract to protect them against the same fraud happening again.  Joelsson agreed to all of the revisions—including the agreement to only collect payments when they were required by the vendors—and that she would only "ask [for] what the vendor requires at the time."

49.     Even more, Joelsson received a settlement payment of approximately $2 million from Regents Bank in connection with Caggiano's fraud.  Joelsson never told Silverboys about the settlement despite the fact that she received the payment on or about November 6, 2014, the very same week of her first meeting with Ms. Silverman.

50.     On November 25, 2014, Silverboys and SOJO executed the agreement (the "Interior Design Contract") Silverboys also believed it had in place protections which would protect it from being  subjected to fraudulent contractors. From the various agreements and representations set forth above and further detailed below, it was assured that:

    i.   All non-custom purchases were to be by competitive bidding;

    ii.   For non-custom goods SOJO would be entitled to a 10% markup from the actual price charged by the vendor to cover its services;

    iii.   For custom goods, SOJO would be entitled to a 30% markup from the actual price charged by the vendor;

    iv.   For custom goods, installation would be included in the vendor's price;

    v.   Installation charges would only be charged for non-custom goods.

51.     Most importantly, the parties agreed that payments would be made by Silverboys to SOJO's account only when payment was actually due to the vendors. In other words, Silverboys was a "pay as you go" client.

52.     Pursuant to the Interior Design Contract, Joelsson and SOJO were to provide, among other things, two core services—"Design Concept Services" and "Interior Installations and Merchandise Purchasing Services."   In connection with these services, SOJO (and Joelsson) agreed to act as Silverboys' purchasing agent.  Specifically, Section 2(B) of the Interior Design Contract obligated SOJO to "[a]ct as [Silverboys'] purchasing representative, supervise receipt of items, coordinate delivery and installation, and prepare punch lists for all Merchandise and Interior Installations."   By agreeing to act as Silverboys' purchasing representative, SOJO became Silverboys' agent with respect to those transactions and thereby assumed certain duties, including but not limited to the duty of fidelity or loyalty.

53.     The Design Concept Services to be provided under the Interior Design Contract included, among other things, conducting an initial design study, inventorying existing furnishings and other items to be potentially utilized in the design, providing space plans together with furniture layouts, and developing a project time line.  Upon completion of the initial design study, Joelsson and SOJO were required to submit the final "Design Concepts" to Silverboys for approval. Part of the Design Concept was established through elaborate presentations.

54.     Upon receiving approval of the "Design Concepts," Joelsson and SOJO were obligated, "as and where appropriate: [to] prepare and submit for [Silverboy's] approval Proposals for completion of Interior Installations and purchase of Merchandise."

55.     The Interior Design Contract also states:  "Merchandise and Installations to be purchased through [SOJO] will be specified in a written 'Proposal' prepared by [SOJO] and

submitted in each instance for [Silverboy's] approval.  Each Proposal will describe the item and

its price to [Silverboys] (F.O.B. point of origin).  [Silverboy's] price shall be the amount charged

to [SOJO] by the supplier of such item ('Supplier Price') which will include supplier's freight."

56.     Separately, and as stated above, Joelsson also agreed to act as an expert witness in

the Silverboys' action against the Original Designer.

57.     On November 26, 2014, Joelsson provided a copy of SOJO's interior design license

for Silverboys' records.  Over the course of several conversations, both before and after execution

of the Interior Design Contract, Joelsson orally reassured Silverboys that she was properly

licensed.  Silverboys ultimately  came to find out, however, that Joelsson was not personally

licensed.  Instead, the license that SOJO operated under belonged to a different individual named

Troy Verrett, who SOJO employees never recalled seeing in the office or doing any work on the

Paradise Island Project.  In or about February 13, 2015, the Probable Cause Panel of the Florida

License Bureau  found probable cause to seek discipline against Verrett because he had signed and

sealed plans prepared by an unlicensed draftsman without ever meeting the client.

**B.  Joellson Brings In a New Architect**

58.     On January 15, 2015, Joelsson met with Ms. Silverman in the Bahamas to do a

walkthrough of the property, highlighting all of the issues with the site and implored Silverboys to

obtain a local architect.   Shortly after, Joelsson directed her assistant and SOJO employee,

Schwartz to write an email (sent from Joelsson's account) to Silverboys stating that she was

concerned about the parties involved in the Paradise Island Project.  Joelsson's email explained

that Blue Point was accustomed to working on commercial projects, not high-end residential

projects, and that installing a local architect who was more familiar with the Bahamas made the

most sense from the standpoint of budget, time, and safety.

59.     Within days of this email, Joelsson presented a Bahamian architect, defendant Whittingham, to take over some of Blue Point's responsibilities and fill the vacancy left by the Original Contractor.  Joelsson assured Silverboys that she had "fully vetted" Whittingham. When in reality the only thing she vetted was Whittingham's willingness to assist her in the expansion of the criminal enterprise to the Bahamas wherein Whittingham and Core would allow her to control their own team of "pay for play" co-conspirators that mirrored and her Florida-based team of vendors and business model provided her with the associated kickbacks.

60.     Joelsson described Whittingham as a person that could help keep Ms. Silverman and her family "safe" because he was familiar with the local building codes and regulations, knew how to navigate importing goods through customs, and was friendly with all the right subcontractors.  Further, since the Paradise Island Project was purportedly at a stage where it only needed the "finishes," Joelsson stated that she would work closely with Whittingham to ensure that the project proceeded in a time- and cost-efficient manner.

61.     Silverboys agreed that SOJO could retain Whittingham as a local SOJO representative.  In the email introducing Whittingham as her new "guy," Joelsson stated that in order for her to be as effective as possible ***everything*** needed to go through her office, and she needed "full control" over the Paradise Island Project.  As such, Joelsson took responsibility for overseeing Whittingham and Silverboys agreed.   Whittingham subcontracted with Core Construction ("Core"), who was engaged to perform construction services for the Paradise Island Project.

62.     Joelsson also suggested that her agent Whittingham, in turn, hold himself as the expert against the former construction contractor, Jones, and Skordas, the phony architect, illegally working in the Bahamas since 2007.

63.     Thereafter, on January 27, 2015, an addendum to the Interior Design Contract was executed memorializing SOJO's expanded role and the hiring of Whittingham (the "Addendum"). In exchange for taking on this new role, SOJO was to receive an additional fee of $5,000 per month for overseeing the construction side of the Paradise Island Project.  And Silverboys agreed to pay Whittingham $175 per hour to work a maximum of three days a week on the Paradise Island Project (or approximately $168,000 through the project's completion).

64.     Thus, with Whittingham in place, Joelsson now had secured full control over both the interior design and construction  of the Paradise Island Project. On January 26, 2015, four days after Joelsson introduced Whittingham, she sent over an email stating the need for everything to go through her office so that she could "have full control and be as effective as possible".  In fact, unbeknownst to Silverboys, it had hired a criminal Enterprise.

## IV.    The Enterprise and Their Criminal Conduct

### A.  The Enterprise: Joelsson and her Co-Conspirators

65.     The SOJO Defendants acted as the hub of the group enterprise.  Decisions as to how much to inflate prices, amount of kickbacks to be paid, and diversion of shipments were made by Joelsson and implemented by her personally or by entities and employees directly under her control.  Joelsson was the mastermind who determined how much she was going to steal, an amount that was frequently tied to the money that Joelsson needed to pay her credit cards, purchase real estate or cover for money she had stolen from other projects.  Joelsson would then create bogus cash requests to send to SOJO's using the amount of the non-Silverboys obligations.  In turn, SOJO's vendors would inflate or adjust their own invoices to submit to SOJO in order to match the numbers provided to them by Joelsson.

66.     Likewise, Joelsson's wholly controlled company, defendant Cudesso, was an integral part of the enterprise.  Clients were not advised that Cudesso was owned by Joelsson. Instead, Cudesso was represented as an independent vendor from whom SOJO could purchase on behalf of client's furniture and accessories at a cheap price.  Employees were instructed to push Cudesso products on clients.  In fact, the employee manual instructed employees to use Cudesso wherever possible and employees were told that they could use another vendor only with Joelsson's express approval.  But Cudesso was simply another way to fraudulently increase fees that would flow through to Joelsson.  Cudesso would purchase non-custom items from a vendor and then turn around and mark the items up by multiples and "sell" them to SOJO.  SOJO would bill Silverboys and its other clients for the inflated costs and pocket the profit on the flip.  Cudesso also served as a vehicle where Joelsson could pool and comingle materials  from different projects and parse them out for projects where she had pocked money and  not used them to purchase the required materials or which she could divert to Headington or her own personal benefit.

67.     Headington was the financial backer of the group. He turned a blind eye towards various red flags indicating fraud, including his receipt of materials that he did not pay for, but which were paid for by other clients, his knowledge that Joelsson was lying about her licensing credentials, and gave legal support to prevent Joelsson scheme from being unmasked.

68.     Whittingham, who purportedly, but did not, supervise the Paradise Island Project site was a key player in that he actively prepared fake invoices and directed vendors to inflate their bills.

69.     The Vendor Defendants all participated and assisted in the preparation and transmittal of fake invoices and quotes that were sent to Silverboys, and, on information and belief, other victims.  In addition, other non-defendant contractors such as Morris Ford, a sheetrock

subcontractor, and Citiscapes, a landscaping service, knowingly assisted in the preparation of fake invoices.

70.     The Vendor Defendants were a crucial part of the enterprise.  Beginning no later than 2010, Joelsson had accumulated a list of preferred vendors.  To get on this list a vendor would have to agree to assist in Joelsson's phony and fraudulent invoicing of clients.

### V.     The Conduct of the Enterprise

#### A. Proposals and Cash Requests

71.     From November 2014 to May 4, 2015, SOJO submitted five cash requests via wire to Silverboys totaling $1,176,861.145.  Silverboys timely made payment on each request.  However, each of the five cash requests were bogus.  Not only were items inflated, but the proposals in the cash requests listed payments that were not being sought by the vendors and payments that were not tied to any vendor invoices actual costs.

72.     On August 3, 2015, SOJO submitted a sixth cash request seeking payment of the amount of $301,272.92.  Silverboys paid the amount promptly via wire transfer.  Silverboys subsequently learned that this cash request sought "deposits" for items already paid for by Silverboys in connection with the previous cash requests that totaled over $1,100,000.  The reference numbers in the accompanying invoices had been altered so as to thwart detection of the overbilling.  Moreover, Joelsson sought and obtained payment for 150% of the actual cost for millwork items included in the sixth cash request even though the vendor did not even have the signed drawings which were a prerequisite for any work to commence. In fact, only 30% of the cost for the millwork items should have been paid prior to receipt of the drawings.

73.     A month later, on September 3, 2015, SOJO sent an additional cash request totaling $401,129.47, which Silverboys paid by wire on September 4, 2015. Again, Silverboys later discovered that the items in the cash requests had previously been invoiced and paid.

74.     Thus, in only one month, SOJO, Joelsson and COE had sent false cash requests totaling $702,402.39 and invoiced items for which Silverboys had already paid . But, because Joelsson had diverted the funds to other unauthorized purposes, Silverboys did not receive the items.

75.     There was a reason why Joelsson was double billing for items that were  paid and overpaid months earlier.  In August 2015 SOJO was broke. That month, defendant 4TEEN7TY, wholly controlled by Joelsson had  purchased a commercial space in the building which houses Joellson's residence for approximately $693,000 and, upon information and belief, required funds to cover the cost.  Moreover, SOJO's corporate credit cards had been declined with respect to other projects.  Joellson desperately needed funds and, upon information and belief, sent the cash requests to cover her immediate cash needs, not for any deposits or payments which were due on the Paradise Island Project.

76.     Joelsson recognized that in order to avoid detection she needed to alter the accounting mask her conduct. As defendant Reed put it bluntly, the idea was to "baffle the clients with bullshit". First, Joelsson hid from clients the fact that she was circumventing the software she promoted-Design Manager-which supposedly was in place to prevent the very frauds she was committing.  Instead, Joellson would direct her internal bookkeeper, Coe, and other SOJO employees to generate and edit documents outside of Design Manager.

77.     What resulted was an accountants' nightmare.  Identification numbers in SOJO proposals assigned to one set of materials would be changed in subsequent proposals with respect

to the same materials. Installation charges included in one price proposal as required by contract would be broken and charged again in a subsequent proposal. Not only was the result incomprehensible to the clients, but internal SOJO employees could not follow the accounting history. Instead, they simply followed Coe's or Joellson's instructions as to what numbers to use.

78.     The truth was that the numbers were whatever Joellson decided they had to be in order for her to skim off enough money to pay for her own personal expenses and for materials needed for other projects where she had already pocketed money designated for that project.

### 1.  Manipulation of SOJO's Project Management Software

79.     SOJO used Design Manager, a management tool specifically created for running an interior design business. Design Manager is capable of tracking every component of every room for a given project, tracking all associated costs and allowing an interior design firm to quickly generate client proposals, purchase orders and invoices.

80.     SOJO's designers would input information into Design Manager. Each designer had access to files with vendor quotes and pricing, providing the information they needed to enter into Design Manager. The designers had access to the two different versions of proposals, estimates, and invoices associated with each of SOJO's vendors. One version of a vendor's proposal, estimate, and invoice, the "SOJO version", reflected the designer net pricing, accounting for various discounts and credits the vendor extended to SOJO. A different version of the proposal, estimate, and invoice, the "client version", did not show these discounts or credits. SOJO kept both versions in a folder on SOJO's computer network and in addition to printed hardcopies.

81.     Joelsson and Coe did not tell the designers what money SOJO had collected from a client or how SOJO allocated within its accounting system any money received from a client.

22

To determine whether a designer could order an item, designers would ask Coe whether Design Manager reflected that SOJO had received a client's payment for the item.

82.     Oddly enough, Design Manager was designed to prohibit the kind of illegal bookkeeping techniques that the SOJO Defendants employed, but they had the power to override those obstacles. For example, one can easily use Design Manager to print relevant invoices and reports.  But instead of using Design Manager to print payment requests, or cash requests, Coe manually created new spreadsheets, using software other than Design Manager, and he manually entered information into those spreadsheets.  SOJO employees found it strange that Coe, rather than using Design Manager's internal functions and capabilities, chose to use separate software to generate his manually created cash requests.

83.     In fact, Joelsson and Coe created an extra set of books outside of Design Manager and overrode the protections built into the system. The result is that cash requests were not sequential, reference numbers were altered from cash request to cash request, and markups were altered in the system. Joelsson and Coe would then generate their own invoices from excel spreadsheets that would contain altered information. They would from time to time then go back into Design Manager and alter entries in order to get it to conform to their spreadsheets. The result were cash requests and invoices which were made out of thin air.

### 2.   SOJO's Creation of Bogus Cash Requests to Satisfy Its Other Obligations

84.     Joelsson used a reconciliation template that was nothing more than a formula to convert whatever amount of money she had spent from her own bank account, on her own credit cards or money she had stolen from the previous client to budget proposals and cash requests to be submitted to another client.

85.     The strategically created internal reconciliation template was specifically designed to confuse the client: it contained random, unexplained percentages and omitted out a critical element – the balance payment that corresponded to the established budget.  SOJO used Design Manager to craft the bogus cash requests, but it was Joelsson who provided the critical piece of information that connected SOJO's clients and vendors in the scheme to defraud: Joelsson started with an amount SOJO owed or had recently paid to a non-Silverboys project or vendor, and sometimes even to her own or SOJO's credit card obligations.

86.     Using a pre-fashioned template, Joelsson worked backwards to generate a number to include on a cash request that SOJO would remit to Silverboys for payment.  When Silverboys complied with the request, the money should have gone to the vendor who, under the Interior Design Agreement, was demanding immediate payment.  Instead, SOJO sent the money out to a variety of vendors or to satisfy debts it had *also* already calculated as part of the overall scheme to defraud.  By the time the vendor got around to creating an invoice, the SOJO Defendants would instruct the vendor to increase the amount of the invoice or pad it with inappropriate costs such as freight or shipping in order to match the cash requests SOJO had already generated and sent to its clients.  SOJO would then satisfy the payment obligation to the vendor it had previously calculated some months prior with money it received from a different source upstream in the criminal scheme.

87.     For example, $366,557 was withdrawn from SOJO's bank account from November 2014 through January 2015.  In order to replace those funds SOJO had disbursed to, presumably, its vendors, on February 11, 2015, SOJO created a version of  "Cash Request 3", which contained a total budget of $512,493.04, and made a cash request of $366,533.58 – the approximate amount of SOJO's bank withdrawals – to Silverboys.  In March 2015, SOJO directed the payment of

$366,764.54 from the Silverboys client deposit account to its own in satisfaction of the cash request.

### 2. SOJO's Creation of Bogus Cash Requests to Satisfy Its Other Obligations

88.     Joelsson, with the aid of her co-conspirators, set out to steal 70% in commission under the Interior Design Contract.  In sum, she would in fact facilitate over $1,277,000 in fraudulent payments from Silverboys in the first six months of the project.  Moving forward, Joelsson went on to set up an additional 70% in commissions from the construction costs and took steps to ensure she would indeed receive it.

### B. The Cudesso Shell Company

89.     Upon information and belief, Joelsson created Cudesso as a vehicle to launder the money that she would receive as commission costs for the construction costs.  Cudesso's corporate registration filing in April 2015, after the execution of the Addendum, corresponds to the timeline in which Joelsson expected to receive incoming commissions from the construction costs.  Tis laundering was accomplished by setting up Cudesso's as a purchaser, seller and storage site for furniture and goods purchased by SOJO's clients.  Joelsson instructed Cudesso to purchase furniture, accessories and other merchandise in bulk quantities and at wholesale prices.  SOJO would then contract with Cudesso, on their clients' behalf, to purchase the furniture at a much higher rate – even up to 700%  markup price that would be passed onto the client.  With that money, Cudesso was able to purchase even more the goods which were in essence covered by the purchasing client.  Not only did Joelssson profit through Cudesso on the purchase of the products, SOJO received a higher fee on the higher purchase price of the goods from the client.

90.     The SOJO Defendants also listed goods purchased from Cudesso as "custom" goods in its proposals and cash requests, and on the accompanying Cudesso invoices.  Pursuant to the Interior Design Contract, SOJO was entitled to a 30% fee, instead of 10%, on the purchase of custom goods.  In designating the wholesale-priced, non-custom goods as custom, SOJO skimmed another 20% in fees for itself. SOJO employees were fully aware of the operation in place between SOJO, Joelsson and Cudesso and one employee even said that she, "didn't want any part of Cudesso and was very uncomfortable – the price and quality would get us in trouble and we did get in trouble."  She further testified that  "they were buying from the suppliers prior to forming Cudesso and Cudesso took over because they could make more of a profit off the client."

91.     Cudesso also charged up to a 300% markup in freight costs – costs which, under the Interior Design Agreement, are not to be passed onto the client in connection with the purchase of non-custom goods.  In this manner, Joelsson and SOJO presented hundreds of thousands of dollars in fraudulent invoices to Silverboys and SOJO's other clients.

**C. Other Fraud by the Defendants Through the Wires and Mail**

92.     In order to support the numbers sought in the cash requests, and put Silverboys and other victims cash in her pocket, Joellson enlisted the help of the other  members of the enterprise, including Whittingham, Core, the Vendor Defendants and other non-defendant vendors.

93.     Whittingham, upon being installed as the architect on the Paradise Island Project, chose Core Construction as his primary contractor. Like Joelsson, Whitingham made it a condition of Core receiving the work that it pay kickbacks. To accomplish that, Core in turn needed to enlist the cooperation of subcontractors.

94.     In early 2015, Custom Building and Maintenance, a company located in the Bahamas, was approached by Core to perform construction work at the Property.  CBM was instructed by Core to bill for a daily rate of $450, fifty percent of which or  $225 , was to be for CBM.  Core and Wittingham received the other fifty percent.  CBM was also requested to provide electronic copies of its billings in XLS format which was not standard practice and, in fact was the first time such a request was ever made of CBM.  Upon information and belief, the full amount of those charges were passed through to Silverboys.  Wittingham's justification for such doubling of costs was that he was being paid for his supervisory role.  However, persons on site noted that Willingham was rarely present.

95.     Core's standard practice was to double the charges and then send to Joelsson to pass on to Silverboys, knowing full well that the extra charges were for no show jobs.  At least the following payments totaling $440,000 were requested by Joelsson and made by Silverboys through the wires as follows:

| PAYMENTS | | CUMULATIVE |
|---|---|---|
| $15,049.76 | 2/20/2015 | $15,049.76 |
| $27,419.92 | 3/5/2015 | $42,469.68 |
| $84,103.38 | 4/14/2015 | $126,573.06 |
| $20,809.64 | 5/6/2015 | $147,482.70 |
| $51,050.77 | 5/19/2015 | $198,433.47 |
| $30,475.87 | 6/12/2015 | $228,909.34 |
| $29,932.67 | 6/19/2015 | $258,842.01 |
| $34,101.95 | 6/29/2015 | $292,934.96 |
| $26,211.32 | 7/14/2015 | $319,155.28 |
| $37,715.33 | 8/4/2015 | $356,870.61 |
| $12,365.23 | 8/24/2015 | $369,235.84 |
| $18,512.50 | 8/24/2015 | $387,784.34 |

| $33,574.03 | 9/7/2015 | $421,322.37 |
|---|---|---|
| | | |

96.     At SOJO'S direction, Bon Vivant issued separate invoices for window treatments that were already included in the contract price, thereby double billing.

97.     SOJO produced two versions of a November 2, 2015 invoice from Bon Vivant for "crafting fees proposal no. 0018". One with $27,250 in installation and 19,200 in crating. The second just for crating.

98.     Visser was also part of the enterpise and agreed to pay to play. On March 1, 2015 Viser provided a quote to SOJO. On March 23, 2015 a SOJO designer told Joelsson "This is the original quote. I will be sending the SOJO quote to you shortly. Ultimately, Visser provided two separate versions of Quote # 501. One billed to SOJO for $42,430 and one to Silverboys for $46,330.

99.     Not only did Joelsson convince the Vendor Defendants to increase their invoices to either match her calculations or to ensure she'd receive a higher cut (10-30% for non-custom/custom goods) in fees from Silverboys, but she collected a percentage on the back-end of moneys due the vendors as a kickback.

100.     Citiscapes an interior scape and landscape firm located in Miami Shores, Florida, and has been doing business with SOJO since 2002. Citiscapes has worked on dozens of landscape and interior scape projects for SOJO, including many luxury apartments and home located in South Florida and elsewhere.

101.     Many of the projects that Citiscapes worked on involved apartments that were owned by Headington. Citiscapes earned more than 1 million dollars in revenue over the years working with SOJO.

28

102.   Early on in the relationship Joelsson told the owner of Citiscapes, Richard Allan Beauregard, that she expected Citiscapes to pay money as a condition to working with SOJO. Initially, Joelsson demanded 10% of the monies charged by Citiscapes. Joelsson would tell Beauregard such things as" don't forget to include something for me" and 'I need a percentage of your billing". Later, Joelsson would increase the size of her kickback demands.

103.   In late 2015, Joeslsson  travelled  with Beauergard  to The Bahamas in order to remedy landscaping problems that had arisen in connection with the Paradise Island Project .

104.   Joelsson asked Beauregard to source new plants for the Paradise Island Project. When Bouregard gave his quote, Joelsson told him to raise it.

105.   Joelsson then demanded that $10,000.00 of the money paid by Silverboys for the landscaping work  be applied to the work Beauregard was doing on Joelsson's penthouse.  This was standard business procedure between Beaurgard and Joelssons,  not only with respect to Silverboys, but with respect to other clients as well and has continued for over 16 years.

106.   On July 20, 2015, Joelsson sent an update email to Silverboys  telling them that everything was moving on schedule. That was false. Less than an hour later, Joelsson received  an email from Juan Carlos stating that the Paradise Island Project was overwhelming and disorganized, and they needed to figure out how to finish it."

107.   Moreover, the project wasn't moving because Joelsson had diverted the funds that Silverboys had paid to complete it. Carusone, the SOJO designated designer on the paradise island Project  responded in July  to an email from a vendor requesting $6,000 by stating we can't pay you  because "this particular client is choosing to pay-as-you-go". Yet, that client had already paid more than $1,100,000.

108.    On August 20, 2015, Joelsson visited the Property and reported, falsely, that "Everything is moving along great".  On August 28, 205, Joelsson  forwarded "cash request 7" asking for an additional $456,125. When Ms. Silverman demanded an explanation as to  how Joelsson had applied Silverboys' money, Joelsson claimed that  some issue with SOJO's computers prevented a response but that she was  concerned about lead times and having funds to place orders so "please let me know when I can expect funds." Joelsson even attempted unsuccessfully to obtain a large retainer so she could expedite orders.  When Joelsson then sent proposals totaling $253,508.52 and not the $456,125 originally asked Joelsson could only say for the unexplained discrepancy" My apologies I shouldn't get involved in accounting and stick to design".  Finally, on September 3, 2015, Joelsson  forwarded a  revised cash request 7 seeking $401,125 which equaled  the amounts sought and paid in cash request 5 and 6. Joellson's accounting shenanigans were unravelling.

## VI.    Silverboys Terminates SOJO and Joelsson and Commences Legal Action

109.    By October of  2015 when Silverboys discovered  that Whittingham and Joelsson had been lying about the progress of the work, Whittingham was fired. The total invoices forwarded to Silverboys to pay for balances purportedly still due on construction  in  October and November totaled   $161,440.09. Silverboys paid in order to  get that work done. However, desperate for cash,  Joelsson deposited the funds in Cudesso's  bank account.

110.    On Nov 2, 2015 , Joelsson  forwarded yet another request for cash which included a proposal 0018 requesting $73,700. Once again, on information and belief, this was an amount that Silveboys had previously paid under a different reference number and reflected the inflated invoices from Core.

111.    As vendors and subcontractors continued to invoice SOJO for work that Silverboys had already paid for, and knowing that the corresponding funds had already been spirited away, the SOJO Defendants' anxiety intensified. Silverboys was refusing to make any more payments. One vendor, who should have been, but was not, paid out of one of the earlier cash payments demanded payment before doing the work that Silverboys  had  been told was done.

112.    In or around March 2016, Silverboys grew suspicious of how its funds had been used and concerned about the status of the Project.  Accordingly, Silverboys started to demand supporting documentation and closely review prior cash requests and Proposals.  Each time Silverboys pulled at a new thread, Joelsson's fraudulent scheme started to unravel.  This fact was not lost on the SOJO Defendants.  As vendors and subcontractors continued to invoice SOJO for work that Silverboys had already paid for, and knowing that the corresponding funds had already been spirited away, the SOJO Defendants' anxiety intensified.  Finally, after weeks of increasingly outlandish excuses and delays, Silverboys terminated its agreements with Joelsson and SOJO for cause.

113.    After investigating the breathtaking scope of the Defendants' mismanagement, Silverboys filed a complaint in this Judicial Circuit on July 12, 2016.  At that time, however, the full extent of the Defendants' wrongdoing was unclear.  The Defendants' extensive fraud and criminal wrongdoing finally came into the plain view only once Silverboys had access to discovery, private investigations were completed, and there was time to untangle a Byzantine web of intentionally opaque invoices, Proposals, and cash requests.  As a result, Silverboys opted to voluntarily dismiss its initial complaint and re-file the instant complaint.

114.    Nevertheless, Joelsson and the Defendants knew the jig was up once the original complaint was filed and quickly worked to move assets into newly formed entities to shield them from any ultimate judgment in this case.

115.    On September 27, 2016, Joelsson formed Spa Ricci.

116.    On October 11, 2016, Joelsson formed Limited Edition, which provides the same services and uses the same offices as SOJO.

117.    On July 25, 2017, Joelsson formed Joelsson Design, which provides the same services and uses the same offices as SOJO.  Joelsson has admitted that she formed Joelsson Design at least partially in response to "this lawsuit."

118.    On September 1, 2017, Joelsson formed Limited Edition Curation, which provides the same services and uses the same offices as SOJO.

119.    On November 22, 2017, Joelsson formed Joelsson Enterprise Managers.

120.    On December 4, 2017, Joelsson formed Joelsson Enterprises.

121.    On December 19, 2018, Joelsson formed Design Ops, which provides the same services and uses the same offices as SOJO.

**VII.    The Creation and Concealment of Constructional Defects and Dangerous Living and Working Conditions**

122.    Silverboys became aware that not only had SOJO defrauded it out of millions of dollars and stolen the materials and merchandise Silverboys had already paid for, but its failure to oversee the construction of the Paradise Island Project [and Whittington] resulted in a cacophony of dangerous working and living conditions.

123.    The construction and safety issues include, but are not limited to:

a.    The SOJO Defendants were required to supervise and manage repairs to the staircase for the Main House so that it would comply with applicable codes and regulations.  The SOJO Defendants represented to Silverboys that the staircase had been repaired in compliance with such codes and regulations.  But long after the

work was supposed to have been completed, Silverboys discovered the staircase in the Main House was not up to code and the staircase steps were uneven, differing in height by as much as 2.50 inches, creating a safety hazard. This not only diminished the value of the Property, but will require additional money and time to fix.

b. Joelsson and the SOJO Defendants used a hybrid material known as Resysta in place of natural wood to complete the sea dock at the Property. This material is not only unsuitable for sea docks, but it was also improperly installed. As a result, the sea dock was completely destroyed during a storm, which would not have occurred had appropriate materials and construction methods been used. The remnants of the dock remain in place, but are unusable. Silverboys will now be required to undertake cleanup and the construction of a new dock.

c. Doors throughout the Property were made using the wrong materials, substandard materials, are missing necessary hardware or components, and/or were improperly installed or manufactured.

d. Cabinetry throughout the Property use the incorrect and substandard materials, are missing necessary hardware or components, were improperly installed or manufactured, and/or were never installed or delivered despite being paid for.

e. Countertops throughout the Property use the wrong or substandard materials, do not match specifications, were improperly installed or manufactured, and/or were never installed or delivered despite being paid for.

f. Backsplashes throughout the Property were improperly installed.

g. Windows, window trimming, and window treatments throughout the Property do not meet specifications and were improperly installed and/or manufactured. Window treatments were also improperly designed and installed, such that windows do not open.

h. Custom furniture throughout the Property was constructed using the wrong or substandard materials, did not match specifications, did not include necessary hardware, was improperly installed or manufactured, and/or was never delivered despite having been paid for.

i. Silverboys selected and approved (and the design specifications called for) the installation of non-slip, shell stone tiles in the pool deck area. Instead, cheaper porcelain tiles (which were not non-slip) were installed, creating a slipping hazard. Silverboys was billed (and paid for) 17,712.42 square feet of shell stone tiles at a cost of $107,482.86, but received 9,731.30 square feet of porcelain tiles (for which SOJO paid $67,561.12). The remaining 9,731.30 square feet of tiling (even the incorrect porcelain tiling) is unaccounted for.

j.  Landscaping was not completed, improperly installed, and used improper soils, fill materials, did not adhere to specifications, and utilized plants that were already unhealthy or dead when they were planted.

k.  Plumbing and plumbing fixtures for bathrooms throughout the property were improperly (or never) installed.  Shower installations and bathroom tiling were also improperly installed and did not function properly.

l.  Walls, floors, and ceilings throughout the Property used wrong or substandard materials, were not finished, did not meet specifications, and/or were not properly installed or manufactured.

m.  Lighting systems throughout the Property used incorrect or substandard materials, were not finished, and were improperly installed and/or manufactured.

124.    Again, by executing the Agreement, the SOJO Defendants accepted responsibility for supervising and managing all of the above-referenced construction project tasks.  It was their duty to ensure that work was completed, done on time and according to specifications, and the final product was suitable for a high-end luxury home.  The unacceptable and virtually unlivable condition that the Property was in demonstrates the SOJO Defendants' *prima facie* failure to discharge its obligations.  Moreover, the SOJO Defendants repeatedly represented to Silverboys that the Paradise Island Project was proceeding according to schedule and was far more advanced than reality.  Long after the Paradise Island Project was supposed to have been completed, it remained in shambles.  Even if not intentional, these failures fell well short of what the parties contemplated and reflected a material departure from industry-wide standards and a reasonable standard of care.

## COUNT I: Violation of RICO, 18 U.S.C. 1962(c)
## (Against All Defendants)

125.    Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 124, above, as if fully set forth again herein.

126.    For purposes of this First Claim for Relief, all Defendants are persons under 18 U.S.C. § 1961(3), as defined in 18 U.S.C. § 1961(3).

127.    The Defendants and other nonparties combined together as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce, to achieve common goals they could not achieve lawfully, and could not achieve without each other's collusion and cooperation.  This enterprise had a purpose, namely operation of an interior design and construction consulting business  with corresponding financial benefits that could not be otherwise or lawfully obtained by Defendants or  those associated with it.  The enterprise had longevity sufficient to permit those associates to pursue, and indeed achieve, the enterprise's primary purpose.

128.    The Defendants conducted and participated in the conduct of the association-in-fact-enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) over an extended period of time, including:

a.  Multiple felony violations chargeable under federal and or State law and punishable by imprisonment for more than one year" and thus "racketeering activity," by knowingly making false, misleading, and/or omissive statements.

b.  Multiple criminal violations of 18 U.S.C. §§ 1341 and 1343 by knowingly making false, misleading, and/or omissive statements as specified above by using the mail and/or wires to transmit such statements and documents as part of a scheme or artifice Additional violations of 18 USC 1341 and 1343 by using the mails and/or wires in pursuit of the scheme to fraudulently criminal violations of 18 U.S.C. § 1952 by travel by or on behalf of the Defendants in interstate commerce and/or use

35

of the mails and other facilities in interstate commerce with the intent to promote,

carry on, or facilitate the promotion or carrying on of unlawful activity,.

129.    The details of these predicate acts are set forth above at Paragraphs 71-109.

130.    As a direct and proximate result of the Defendants' racketeering activities and

violations of 18 U.S.C. § 1962(c), Silverboys  has been injured in its business and property.

131.    As a result, Silverboys suffered actual damages in an amount to be determined at

trial, but believed to be over $7 million   dollars.  Moreover, Silverboys is entitled to recover treble

the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance

with 18 U.S.C. § 1964(c).

## COUNT II: Conspiracy to Violate RICO, 18 U.S.C. 1962(d)
### (Against All Defendants)

132.    Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 124,

above, as if fully set forth again herein.  As set forth above, all of the Defendants agreed and

conspired to violate 18 U.S.C. § 1962(c), by forming the illegal association-in-fact enterprise set

forth above and conducting and participating in the conduct of its affairs through a pattern of

racketeering activity.

133.    Each Defendant, as set forth above, committed one or more overt acts in furtherance

of the conspiracy.

134.    Each Defendant necessarily recognized, given the objective of the conspiracy, and

agreed that the conspiracy would commit at least two predicate acts.

135.    In addition to this conspiracy, all of the Defendants agreed and conspired to violate

18 U.S.C. § 1962(c),by conducting and participating in the conduct of through a pattern of

racketeering activity, and each Defendant, as set forth above committed one or more overt acts in

furtherance of the conspiracy and necessarily recognized, given the objective of the conspiracy, and agreed that the conspiracy would commit at least two predicate acts.

136.    As a direct and proximate result of Defendants' conspiracy, their overt acts taken in furtherance thereof, and their violations of 18 U.S.C. § 1962(d), Silverboys has been injured in its business and property.

137.    As a result, Silverboys suffered actual damages in an amount to be determined at trial, but believed to be over $7 million dollars.  Moreover, Siverboys  is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

## COUNT III: Fraud
### (Against the SOJO Defendants)

138.    Plaintiff repeats and re-alleges Paragraphs 1 through 124 above, as if fully set forth again herein.

139.    Joelsson, Coe, and SOJO made repeated misrepresentations of material fact.  Each invoice, Proposal, and cash request authored by Joelsson, Coe, and/or SOJO was an affirmative representation that:  (a) the prices stated therein were true and correct and complied with the pricing provisions of the Agreement and the defendants' duties of loyalty and good faith and fair dealing; (b) all amounts paid by Silverboys would be utilized for the goods or services reflected therein; and (c) the referenced items or services had already been received or would be received (or payment was otherwise required at that time).

140.    Joelsson, Coe, and SOJO knew, or were reckless in not knowing, that Silverboys would interpret each invoice, Proposal, and/or cash request in this way.  Joelsson, Coe, and SOJO also knew, or were reckless in not knowing, that invoices, Proposals, and/or cash requests contained false statements and funds would not be used for their stated purpose.

141.     Based on the contractual and personal relationship between Silverboys, on the one hand, and Joelsson, Coe, and SOJO, on the other hand, Silverboys justifiably relied on their representations.

142.     Despite their representations to the contrary, Joelsson, Coe, and/or SOJO authored or falsified to defraud Silverboys as detailed above.

143.     As a direct and proximate result of these frauds, Silverboys suffered monetary damages in an amount to be determined at trial.

### COUNT IV: Aiding and Abetting Fraud
### (Joellson, Coe, Cudesso, and the Vendor Defendants)

144.     Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

145.     Joellson and Coe were each directly involved in drafting, reviewing, editing, and/or disseminating falsified invoices, Proposals, or cash requests.  They knew, or should have known, the these representations were false, misstated the true price, and/or the underlying items or services had not been provided (or had not been provided in full).  In addition, Joelsson and Coe knew that Silverboys' funds were being misappropriated from the SOJO and Silverboys' accounts and used for expenses that were unrelated to the Project.  They also knew that Silverboys' payments were not retention fees, and were deposited to be held in trust and exclusively used for Silverboys' benefit.

146.     The Vendor Defendants and Cudesso each knew that their invoices or bills did not accurately state the price and/or quantity of items or services.  They also knew, or should have known, that it was improper for SOJO to instruct them to inflate the cost of items or services, include secret commissions or kickbacks, and that payments had been received for items or services that had never been provided.

147.    The relevant Defendants therefore all knew of SOJO's and Joelsson's fraud, and actively participated and provided substantial assistance and encouragement.  Each time one of the relevant Defendants falsified invoices or bills, or knowingly approved the dissemination of falsified invoices or bills, they committed a discrete act of wrongdoing that aided and abetted that fraud.

148.    As a direct and proximate result of the relevant Defendants' acts, Silverboys suffered monetary damages in an amount to be determined at trial.

## COUNT V: BREACH OF FIDUCIARY DUTY
### (Against SOJO)

149.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

150.    Pursuant to the terms of the Agreement, SOJO agreed to act as Silverboys "purchasing representative."  Further, by executing the Agreement, SOJO was an agent of Silverboys regarding the provision of onsite construction and interior design services.  As SOJO was an agent of Silverboys, SOJO assumed fiduciary duties, including the duty of fidelity or loyalty, the duty of disclosure, and the duty of good faith.

151.    In addition, SOJO had access to Silverboys' operational account and transferred Silverboys' funds into a client deposit account under SOJO's exclusive control.  Thus, SOJO was placed in a special position of trust and confidence giving rise to fiduciary duties, including the duty of loyalty, duty of care, duty of disclosure, and the duty of good faith.

152.    SOJO breached its fiduciary duties to Silverboys by committing the following acts: (i) overbilling for items and services that were received; (ii) concealing overcharges, secret commissions, and kickbacks; (iii) conspiring with the Vendor Defendants and others to inflate prices and overbill Silverboys; (iv) misappropriating funds belonging to Silverboys; (v)

misappropriating personal property belonging to Silverboys; (vi) engaging in self-dealing transactions without disclosure; (vii) submitting falsified invoices, Proposals, and/or cash requests; and/or (viii) failing to adequately supervise and/or manage the Project.

153.    As a direct and proximate result of these breaches of fiduciary duty, SOJO unjustly enriched itself and caused Silverboys to suffer monetary damages in amounts to be determined at trial.

### COUNT VI: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Joellson, Coe, Cudesso, the Vendor Defendants,  Wittingham, Core, and Reed)

154.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

155.    Joelsson, Coe, Schwartz, Cudesso, and the Vendor Defendants each knew that SOJO was acting a purchasing representative (*i.e.*, agent) on behalf of Silverboys.  As a result, each knew, or should have known, that SOJO owed fiduciary duties to Silverboys.

156.    For the same reasons detailed in Count III (aiding and abetting fraud) above, the relevant Defendants each aided and abetted SOJO's breaches of fiduciary duty.

157.    As a direct and proximate result of the relevant Defendants' conduct, Silverboys suffered monetary damages in an amount to be determined at trial.

### COUNT VII: CIVIL CONSPIRACY

### (All Defendants)

158.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

159.    Defendants agreed to inflate the price of items and services provided (or ostensibly provided) in connection with the Project, and committed over acts in furtherance of the conspiracy by:  (i) submitting falsified invoices or bills for items or services that were never provided; (ii)

billing multiple times for items or services that had already been provided; (iii) providing items or services that were different than what was paid for or required; and (iv) artificially inflating the prices for items or services to conceal secret commissions or kickbacks.

160.    Through these actions, the Defendants are all culpable (and liable for) all harms caused by the underlying conspiracy, which caused Silverboys to suffer monetary damages.

## COUNT VIII: BREACH OF CONTRACT
### (Against SOJO)

161.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

162.    The Agreement is a legally valid, binding, and enforceable contract between SOJO and Silverboys.

163.    SOJO materially breached the Agreement or SOJO's duty of good faith and fair dealing by, among other things:  (i) seeking and receiving cash deposits and wires from Silverboys for items and services that were never received; (ii) failing to adhere to the pricing provisions of the Agreement; (iii) charging (and concealing) secret commissions and kickbacks; (iv) misappropriating (and failing to disclose) credits, discounts, and referral fees; (v) failing to properly supervise and/or manage onsite construction and landscaping projects; (vi) misappropriating Silverboys' funds and personal property; (vii) changing design specifications or installing items that did not comply with design specifications without Silverboys' knowledge or consent; (viii) failing to complete the Project on time or within a reasonable time; (iv) breaching fiduciary duties and the implied covenant of good faith and fair dealing; and (x) conspiring with the Vendor Defendants to defraud Silverboys.

164.     As a direct and proximate result of SOJO's material breaches of the Agreement, Silverboys suffered monetary damages in an amount to be determined at trial.  But for the relevant Defendants' material breaches, Silverboys would not have suffer such damages.

### COUNT IX: CONVERSION
### (Against Joelsson and SOJO)

165.     Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

166.     Joelsson and SOJO misappropriated and asserted dominion over Silverboys' property, including but not limited to Silverboys' funds, furniture, custom and/or non-custom goods, discounts, credits, and/or referral fees.  Once Silverboys paid for items and services, regardless of whether or not actually received, they became the property of Silverboys.

167.     Joelsson and SOJO intentionally ordered more items and services than were necessary for the Project and then misappropriated the same for their own personal benefit or use in business projects that were unrelated to Silverboys.  For example, Joelsson used her controlled entity Cudesso to order items in bulk, charged Silverboys for the entire purchase order, but then retained the excess items.  In addition, as explained above, many items were paid for by Silverboys but are presently unaccounted for.  Also, Joelsson and SOJO made undocumented "loans" to two entities—4TEEN7TY and Spa Ricci—controlled by Joelsson using funds deposited by Silverboys without Silverboys' knowledge or consent.

168.     These actions (and others) were inconsistent with Silverboys' ownership.

169.     As a direct and proximate result of the above-referenced acts, Silverboys suffered monetary damages in an amount to be determined at trial.

## COUNT X: VIOLATION OF
## FLORIDA DECEPTIVE AND UNFAIR PRACTICES ACT
### (SOJO Defendants and Cudesso)

170.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

171.    The SOJO Defendants and Cudesso engaged in unconscionable and unfair practices and deceptive acts, including but not limited to creating misleading (and false) invoices, Proposals, and cash requests to conceal overbilling, representing that non-custom goods were in fact custom goods, and collecting secret commissions or kickbacks, all in violation of Fla. Stat. § 501.201, *et seq.*

172.    As a direct and proximate result of the relevant Defendants' deceptive acts and unfair trade practices, Silverboys suffered monetary damages in an amount to be determined at trial.

## COUNT XI: SUCCESSOR LIABILITY
### (Against the Successor Defendants)

173.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

174.    All of the Successor Defendants were formed to fraudulently conceal the SOJO Defendants' assets to protect them from liability.

## COUNT X: ACCOUNTING
### (Against SOJO)

175.    Plaintiff repeats and re-alleges Paragraphs 1 through 124, above, as if fully set forth again herein.

176.    At all relevant times, SOJO was an agent and fiduciary of Silverboys.  As such, SOJO owed fiduciary duties to Silverboys, including the duty of loyalty, duty of care, duty of good faith, and duty of disclosure.

177.     For reasons outlined above, SOJO breached its fiduciary duties by engaging in self-dealing, misappropriating funds and personal property, failing to properly supervise subcontractors and employees, and failing to disclose the details of the Defendants' systemic overbilling, secret commissions, and fraud.

178.     To date, SOJO has been unable or unwilling to account for all of the items and funds that were entrusted to it as a fiduciary and agent of Silverboys.

179.     Silverboys has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Silverboys, LLC respectfully requests that the Court enter an Order granting the following relief:

(i)      An accounting of all Silverboys' funds paid and profits derived by the Defendants from the Project;

(ii)     Monetary damages in an amount to be determined at trial and all pre-judgment interest;

(iii)    Disgorgement of all profits and unjust gains;

(iv)     Punitive damages in an amount to be determined at trial;

(v)      Attorneys' fees and costs; and

(vi)     Such other and further relief as the interests of justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 31, 2019                  Respectfully submitted,

                              By: *s/ Scott  B. Cosgrove*
                                   Scott B. Cosgrove
                                     Florida Bar No. 161365
                                   James R. Bryan
                                     Florida Bar No.  696862
                                   **León Cosgrove, LLP**
                                   255 Alhambra Circle, Suite 800
                                   Coral Gables, Florida 33133
                                   Telephone: (305) 740-1975
                                   Facsimile:  (305) 437-8158
                                   Email:  scosgrove@leoncosgrove.com
                                   Email:  jbryan@leoncosgrove.com
                                   Email:  anoonan@leoncosgrove.com

                                        *AND*

                                   Steven G. Storch
                                   **STORCH AMINI PC**
                                   2 Grand Central Tower
                                   140 East 45th Street, 25th Floor
                                   New York, NY 10017
                                   Telephone: 212.490.4100
                                   Facsimile: 212.497.4208 - Fax
                                   Email: sstorch@storchamini.com

                                   *Counsel for Silverboys, LLC*