UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  1:19-cv-23171-KMW

Silverboys, LLC,

       Plaintiff,

v.

Sofia Joelsson, SOJO Design, LLC,
Chayanne Xavier Coe, Cudesso, LLC,
Sofia Joelsson Design, LLC, Joelsson Enterprise
Managers, LLC, Sofia Joelsson Enterprises, LLC,
Limited Edition, LLC, Design Ops, Inc., Spa Ricci,
LLC, 4TEEN7TY, LLC, Total Window, Inc.,
Bon Vivant Custom Woodworking, Inc.,
Fine Surfaces and More, Inc., and Visser Closets,
Inc.

       Defendants.

_____/

## AMENDED COMPLAINT

Silverboys, LLC ("Plaintiff" or "Silverboys"), by and through its undersigned counsel, files

this Amended Complaint for damages against Defendants Sofia Joelsson ("Joelsson"); SOJO

Design, LLC ("SOJO"); Chayanne Xavier Coe ("Coe") (collectively, the "SOJO Defendants");

Cudesso, LLC ("Cudesso"); Sofia Joelsson Design, LLC ("Joelsson Design"); Joelsson Enterprise

Managers, LLC ("Joelsson Managers"); Sofia Joelsson Enterprises, LLC ("Joelsson Enterprises");

Limited Edition, LLC ("Limited Edition"); Design Ops, Inc. ("Design Ops"); Spa Ricci, LLC

("Spa Ricci"); 4TEEN7TY, LLC ("4TEEN7TY"); Total Window, Inc. ("Total Window"); Bon

Vivant Custom Woodworking, Inc. ("Bon Vivant"); Fine Surfaces and More, Inc. ("Fine

Surfaces"); and Visser Closets, Inc. ("Visser").

## PRELIMINARY STATEMENT

1.      This action arises from an elaborate fraudulent scheme perpetrated by Sofia Joelsson through her phony interior design company. Together with a team of co-conspirators, and in coordination with her employees, bookkeepers, and other selected controlled vendors, SOJO bilked Silverboys out of millions of dollars.  This international fraudulent enterprise targeted high net worth clients in markets around the world (such as South Beach, The Hamptons, The Caribbean, and NYC) including Silverboys, a company formed by Karen and Henry Silverman to renovate the vacation home they purchased in the Bahamas in 2013.

2.      Beginning in November 2014 until Joelsson and her team were terminated in early March 2016, Joelsson and her co-conspirators stole millions of dollars from Silverboys through every imaginable fraudulent scheme.  It was only after learning that the project was woefully behind schedule as a result of her intentional delays (despite Joelsson's repeated representations that the project was proceeding to plan), that Silverboys began to uncover Joelsson's scheme. Silverboys' investigation revealed countless egregious examples of exceptionally poor and endangering workmanship without any rational explanation.   When Joelsson realized that Silverboys discovered her fraud, , she moved money to newly created entities in an effort to shield her  ill-gotten gains.  She further attempted to cover up her conduct through, among other things, the fabrication of documents.

3.      Joelsson is a former Miss Sweden and a self-proclaimed "Penthouse Queen" of South Beach.  Silverboys believes that she created SOJO, a putative design company, with the assistance of oil magnate and billionaire Tim Headington ("Headington").  Headington is well known in Hollywood circles, and has produced such films as Argo, Hugo, Jersey Boys and others. Silverboys further believes that Headington has financially supported SOJO via his controlled

companies ("Headington Realty and Capital"), whose financial support helped prop up SOJO as a legitimate and credible design company.

4.      Silverboys first encountered Joelsson in November 2014, after its first run-in with a corrupt design and construction team.  Specifically, Silverboys' first design and construction team operated a complicated fraud scheme that led to arrests for wire fraud, customs and immigration fraud, and a multimillion dollar civil award to Silverboys.  Thus, when Silverboys was vulnerable having been victimized once before and in need of a trusted advisor, it was introduced to Joelsson.  Joelsson represented that she was a licensed interior designer who "took fraud seriously" as she too had been a victim of fraud at the hands of her own bookkeeper.  Joelsson told Silverboys that she could (i) serve as Silverboys' expert witness in connection with a civil proceedings against the prior fraudsters, and (ii) finish the project (which at that point, was approximately 90% complete).  Silverboys thus decided to engage Joelsson. As it turned out, the engagement was a calamity.

5.      Instead of assisting Silverboys, SOJO and her co-conspirators would waste no time aligning with the same fraudsters that Silverboys had exposed before.  Joelssom met with them in person and mirrored their fraudulent behaviors.  Joelsson was not a licensed designer as she claimed.  Indeed, she had been fined years earlier (twice in 2003 and again in 2004, 2007, 2010 and 2013) for falsely representing and marketing herself as one.

6.      As part of their ongoing effort to cover the elaborate scheme, Joelsson and co-conspirator Chayanne Coe corrupted the integrity of their own financial and project reporting systems by overriding their entries, creating fraudulent proposals, purchase orders, invoices, and contracts (thus creating multiple sets of books to defraud clients), filing false Bahamian duty and VAT statements, commingling funds, and bundling multiple clients under Silverboys' account.

Joelsson laundered her stolen funds into real estate purchases and shell companies to camouflage the illegal origin of the funds. The effort to hide the scheme exists to this day, as no complete and accurate inventory of items delivered has ever been provided to Silverboys.

7.     SOJO sent Silverboys over a dozen requests for payments (which Silverboys made) totaling more than $1.98 million in a one-year period.  Joelsson also obtained an additional $2.818 million from Silverboys for construction invoice payments generated under her control.  Instead of using the payments for the intended purpose, Joelsson diverted the payments to her shell companies to fund her extravagant lifestyle.  This fact has been confirmed via Juan Carlos Pombo, a former SOJO insider, who explained that payments were immediately diverted to pay off Joelsson's bills and credit card balances while Silverboys' goods were secreted to warehouses to be resold.

8.     On many occasions, when SOJO sent cash requests to Silverboys for the purchase of goods for the project, SOJO had not even contacted vendors to obtain the price quotes that appeared on those cash requests.  Therefore, the cash requests SOJO demanded payments on for purportedly paying third-party vendors contained fictitious prices that Joelsson simply made up.

9.     As part of the scheme, Joelsson and Coe issued a fraudulent web of "budgets," "cash requests," and "proposals" for the purchase of furniture and fixtures.  These documents were designed to extract even more money from Silverboys by billing up to four times for the same items, adding fictitious sales tax, inventing "ghost items" of goods never delivered, charging false installation, fabrication, and shipping and travel expenses, and even stealing credits that were granted to Silverboys while simultaneously charging Silverboys for those same credited items.  Running balances on these documents were (a) deliberately incorrectly summed, (b) never reconciled sequentially or in the aggregate, (c) not accurately credited against actual cash

payments, or (d) deleted or omitted entirely.  In sum, Joelsson's manipulation of the documentation sent to Silverboys was highly orchestrated and endless.

10.     The manipulating of proposals and invoices was one method by which Joelsson was able to defraud Silverboys.  A proposal is intended to show how much items will cost once paid in full and are prospective in nature.  In contrast, invoices are only generated after those items have been paid—*i.e.*, an invoice is like a receipt—and are retrospective.  By inflating the budgeted cost of items and only accepting percentages of the budgeted amounts, SOJO was able to collect a vast amount of money without ever producing an invoice.  In fact, the SOJO Defendants would not generate an invoice for *anything* until September 2015, although Joelsson had collected $984,740 in proposals by September. This allowed the SOJO Defendants to constantly scramble items across multiple proposals because nothing was final.

11.     Joelsson utilized these methods by having multiple vendors, known as "play ball vendors" (Visser, Bon Vivant, Fine Surfaces, Total Window, and Cudesso), abide by the SOJO business model providing "SOJO version invoices" vs "Client version invoices." The Client version invoices were client-facing and SOJO version invoices were unpopulated templates of the vendor's own invoices.  Joelsson demanded the ability to set the quotes and prices for vendors, thereby controlling wholesale pricing with the purpose of covering up her kickbacks.

12.     Joelsson, with this vendor assistance, was able to fraudulently induce Silverboys into giving her large sums of money that mirror amounts she needed to replenish her bank account and to pay her personal and business credit cards.  Joelsson went so far as to sequentially design her quotes specifically around recouping money that she had spent the month before.  Her subcontractors provided multiple versions of invoices to allow Joelsson to manipulate quotes to be the customized prices she needed, backing the numbers into the quote and making it impossible

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

for her to reconcile how Silverboys' money had been spent.

13.     Joelsson also concealed her fraud by "instructing her vendors to increase their prices, demand goods for free, and request kickbacks in the form of checks, material goods, or cash," according to Pombo.

14.     Pombo also explained that Joelsson demanded trade discounts from vendors of 30-40% and had this percentage added to the quote before it became an invoice and prior to Joelsson adding an additional 30% on the client's cash request.  At the same time, Silverboys was deceived into thinking that its only up-charge was 30% on custom items, as their contract indicated.  These kickback schemes confirmed by other former insiders, including Blanca Wall ("Wall"). .

15.     In addition to cash kickbacks, Joelsson received free goods, which Silverboys believes were sent to properties owned (directly or indirectly) by her and Headington.

16.     Joelsson's scheme was assisted by her demand that she have full control over the construction side of the project.  This control allowed Joelsson to receive kickbacks on construction items of $1.2M of funds paid by Silverboys.

17.     Joelsson also obtained full control of Silverboys' project by advocating for Silverboys to have a local representative on the project to navigate the codes and laws in the Bahamas.  She insisted Silverboys expand their contract with an addendum for SOJO to oversee the completion and remediation work for the project through Robert Whittingham ("Whittingham").  Whittingham was promised to "be a full-time part of SOJO Design" and to "report directly and only to SOJO Design."  Further, Whittingham was to serve as Joelsson's agent, and recommended that SOJO hire Core Construction ("Core").  Whittingham agreed to document all the deficiencies and overcharges from the prior individuals who had defrauded Silverboys.  Core has since produced the fraudulent invoices used by SOJO in her scheme.  Indeed, SOJO

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

created fraudulent hours under Whittingham to systematically overcharge Silverboys (roughly $50,000 per month on average).

18.     By the end of 2015, Silverboys had grown concerned with Joelsson's claims that the project would  soon be completed, and Silverboys requested a reconciliation of how their money had been spent.  Joelsson continued to cover-up the fraud, claiming that she could not easily provide past invoices for Silverboys.  Finally, after weeks of increasingly outlandish excuses and delays, Silverboys terminated the Agreement for cause. Silverboys' subsequently learned that vendors on the Silverboys project claimed that they were due money, which SOJO refused to pay. According to former employee Pombo, "Joelsson never paid the balances owed to vendors because she felt it was her kickback for doing business with her."

19.     After Joelsson's termination, Silverboys demanded an updated list of outstanding items.  Joelsson took weeks to respond, giving various excuses for her inability to provide simple information.

20.     Finally, on or about May 11, 2016, Joelsson delivered over 200 pages of documents that bore no resemblance to documents previously received by Silverboys.

21.     In January 2019, Joelsson produced a set of invoices that served as her accounting for the use of Silverboys' funds, as well as hundreds of pages of doctored, redacted, and irrelevant documentation.  An examination of those documents revealed that they were entirely fictitious and conflicted with documents previously produced by her and her vendors.  Joelsson not only stole millions from Silverboys, but also left their property in the Bahamas in a dangerous condition.

22.     Silverboys would discover that the fraud perpetrated upon them stemmed from SOJO's modeling of crimes committed by its former bookkeeper, Max Caggiano ("Caggiano"), who fled Florida and was arrested in California in 2011.  Caggiano pleaded guilty to 18 counts of

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

grand theft in the first degree, Fla. Stat. § 812.014, and 28 counts of money laundering, Fla. Stat. §§ 896.101, 777.011, and was sentenced to five years in prison. *See State of Florida v. Caggiano*, No. F 11-028894 (Fla. 11th Cir. Ct. Feb. 22, 2013). The methods of fraud Caggiano allegedly used against other SOJO clients had been perfected by SOJO and subsequently employed against Silverboys and others. SOJO not only perfected but would appear to have orchestrated the entire system of accounting fraud because her run in with the law predates Caggiano.

23.     Joelsson has also attempted to hide her ill-gotten gains by diverting funds received from Silverboys into entities which she controlled. For example, as of August 31, 2015, Joelsson purchased a piece of real estate valued at $693,000.00. Joelsson would also steal this amount from Silverboys within the first six months of her engagement through fraudulent invoices created by her co-conspirators Whittingham and Core. Joelsson later put the property into foreclosure and simultaneously listed Silverboys as the lender to further obfuscate the source and use of the stolen funds.

24.     In one particular instance of her callousness, a SOJO designer would email Joelsson a "Millwork Priority List" of items containing every piece that was supposed to have been ordered from Bon Vivant, including a playroom bookcase and daybed for Silverboys' children. Joelsson responded within minutes, frantically asking whether everything had been ordered and coldly adding: "we don't need a custom playroom bed, its [sic] just a plat[form] that Robert [Whittingham] can build and a mattress on top of it with pillows as well as we don't need the playroom bookcase." By September 30, 2015, Joelsson had collected $291,000 on millwork, which was $100,000 over the optimal sales price. Joelsson also over-collected this same amount for Total Windows' materials, and while her own accounting reveals a $3.2M collection from design items, Joelsson's true cost for the items was only $548,000.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(4), as this action is between citizens of different states, and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.00.

26.    Specifically, there is complete diversity between the parties because Silverboys is not a citizen of the same state as any of the defendants.

27.    Plaintiff Silverboys is a Delaware limited liability company managed by Karen L. Silverman and Henry R. Silverman (collectively, the "Silvermans"), who are citizens of the state of New York, and none of the Defendants are citizens of New York. The Silvermans are domiciled in the state of New York, as it is their permanent home and where they intend to remain indefinitely.

28.    Defendant Coe is a citizen of the state of Florida, as Coe is domiciled in the state of Florida.

29.    Defendant Joelsson is a citizen of the country of Sweden.

30.    Defendant Bon Vivant is a citizen of the state of Florida, as it is incorporated in Florida and maintains its principal place of business in Florida.

31.    Defendant Total Window is a citizen of the state of Florida, as it is incorporated in Florida and maintains its principal place of business in Florida.

32.    Defendant Fine Surfaces is a citizen of the state of Florida, as it is incorporated in Florida and maintains its principal place of business in Florida.

33.    Defendant Visser Closet is a citizen of the state of Florida, as it is incorporated in Florida and maintains its principal place of business in Florida.

34.    Defendant Design Ops is a citizen of the state of Florida, as it is incorporated in

Florida and maintains its principal place of business in Florida.

35.     Defendant Cudesso is a limited liability company organized under the laws of Delaware with its principal place of business in Miami-Dade County, Florida.  Upon information and belief, Defendant Joelsson is its sole member.

36.     Defendant SOJO is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Upon information and belief, Defendant Joelsson is its sole member.

37.     Defendant Joelsson Design is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Upon information and belief, Defendant Joelsson is its sole member.

38.     Defendant Joelsson Managers is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida. Upon information and belief, Defendant Joelsson is its sole member.

39.     Defendant Joelsson Enterprises is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida. Upon information and belief, Defendant Joelsson is its sole member.

40.     Defendant Limited Edition is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.  Upon information and belief, Defendant Joelsson is its sole member.

41.     Defendant Spa Ricci is a limited liability company organized under the laws of the state of Florida with its principal place of business in Miami-Dade County, Florida.   Upon information and belief, Defendant Joelsson is its sole member.

42.     Defendant 4TEEN7TY is a limited liability company organized under the laws of

the state of Florida with its principal place of business in Miami-Dade County, Florida.  Upon information and belief, Defendant Joelsson is its sole member.

43.     Venue is appropriate in this district pursuant to 28 USC § 1391(b) because the events giving rise to these claims occurred in this district.

## THE PARTIES

44.     Plaintiff Silverboys was created to purchase, build, renovate, furnish and decorate. an existing 17,000 square foot residence (the "Main House") and separate staff quarters (the "Staff House") (collectively, the "Property").

45.     Defendant Joelsson is the owner and public face of SOJO, which she manages and controls alongside a number entities relevant to this action, including but not limited to Cudesso, Joelsson Design, Joelsson Managers, Spa Ricci, 4TEEN7TY, Design Ops, and Joelsson Enterprises.

46.     Defendant SOJO is owned and controlled by Joelsson, and directly contracted with Plaintiff to provide services in connection with the project regarding the Property (the "Project" or "The Paradise Island Project").

47.     Defendant Coe was responsible for SOJO's business development and accounting and worked under the direction or control of Joelsson.  Coe actively participated in, and knowingly assisted, the fraudulent scheme to defraud Silverboys.

48.     Defendants Joelsson, SOJO, and Coe are collectively referred to herein as the "SOJO Defendants."

49.     Defendant Cudesso (d/b/a Curated Living) is controlled and owned by Joelsson. Joelsson purported to purchase items for the Project from Cudesso, representing Cudesso to be an unaffiliated third party vendor, when in fact it was nothing more than an vehicle used by SOJO to

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

purchase items from vendors at low prices and resell those same items to Silverboys at grossly inflated prices.

50.     Defendant Joelsson Design is owned and/or controlled by Joelsson.   Upon information and belief, Joelsson and/or SOJO have transferred assets to Joelsson Design in an attempt to shield those assets from creditors such as Silverboys.

51.     Defendant Joelsson Managers is owned and/or controlled by Joelsson.   Upon information and belief, Joelsson and/or SOJO have transferred assets to Joelsson Managers in an attempt to shield those assets from creditors such as Silverboys.

52.     Defendant Joelsson Enterprises is owned and/or controlled by Joelsson.   Upon information and belief, Joelsson and/or SOJO have transferred assets to Joelsson Enterprises in an attempt to shield those assets from creditors such as Silverboys.

53.     Defendant Limited Edition is owned and/or controlled by Joelsson.   Upon information and belief, Joelsson and/or SOJO have transferred assets to Limited Edition in an attempt to shield those assets from creditors such as Silverboys.

54.     Defendant Design Ops is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have transferred assets to Design Ops in an attempt to shield those assets from creditors such as Silverboys.

55.     Defendant Spa Ricci is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have transferred assets to Spa Ricci in an attempt to shield those assets from being pursued by creditors such as Silverboys.

56.     Defendant 4TEEN7TY is owned and/or controlled by Joelsson.  Upon information and belief, Joelsson and/or SOJO have transferred assets to 4TEEN7TY in an attempt to shield those assets from creditors such as Silverboys.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

57.     Defendants Joelsson Design, Joelsson Managers, Joelsson Enterprises,  Limited Edition, Design Ops, Spa Ricci, and 4TEEN7TY are collectively referred to herein as the "Successor Defendants."

58.     Defendant Bon Vivant is an independent vendor which was responsible for supplying and installing wooden millwork building components in the houses as a part of the Project.

59.     Defendant Total Window is an independent vendor which was responsible for supplying and installing all custom window treatments and drapery for the houses as a part of the Project.

60.     Defendant Fine Surfaces is an independent vendor which was responsible for supplying and installing slabs of marble which were used in the construction of custom-built furniture for the houses as a part of the Project.

61.     Defendant Visser is an independent vendor which was responsible for installing closets in the houses as a part of the Project.

62.     Defendants Bon Vivant, Total Window, Fine Surfaces, and Visser are collectively referred to herein as the "Vendor Defendants."

63.     All conditions precedent to the filing of this lawsuit, if any, have been performed, excused, or waived.

## FACTS COMMON TO ALL CAUSES OF ACTION

**I.**     **Joelsson is Introduced to Silverboys After it Terminated the Original Design and Construction Team**

**A.**     **Joelsson was Hired to Remedy Prior Fraud**

64.     In 2013, Silverboys purchased two lots in the Ocean Club Estates on Paradise Island in the Bahamas.  The Property included the Main House and the Staff House.

65.     The Property was purchased with the intention of renovating the Main House and Staff House, constructing an additional 4,500 square foot guest house (the "Guest House"), constructing a swimming pool and renovating an existing dock, and installing new landscaping. Upon completion of the Paradise Island Project, Silverboys planned to both personally use the Property and generate revenue by renting it out to third parties as a vacation home.

66.     In the fall of 2013, Silverboys retained a previous designer to perform interior design services for the Property, a purported NY architect, Yianni Skordas ("Skordas"), and a construction company named "Inline Construction Co.," owned by Michael Jones ("Jones") (together with the previous designer and Skordas, the "Original Team").

67.     In September 2014, Silverboys terminated "the Original Team" when it discovered that they had been fraudulently billing Silverboys and were not all duly licensed within their respective fields.

68.     Subsequent legal action against the Original Team confirmed that the Original Team had conspired to defraud Silverboys, stolen its property, laundered money, transported illicit goods, created fraudulent invoices to disguise their scheme to steal, and used the Bahamas tax benefits to defraud the country as well as Silverboys.

69.     In part, the Original Team defrauded Silverboys by conspiring with vendors and subcontractors to artificially inflate prices charged to Silverboys in exchange for secret kickbacks and commissions.

70.     In addition, they would lock up furniture in warehouses and withhold other containers with material goods that had been paid for, loot appliances in route to the Bahamas, and steal government documents from the Bahamian ministry of work in efforts to hide their crimes.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

71.     A New York arbitration panel found that the previous designer had "willfully and knowingly converted and concealed [Silverboys'] personal property," and awarded Silverboys compensation.  An arbitration panel in the Bahamas found Jones and Inline Construction liable for "secret commissions and kickbacks" in relation to the Silverboys Project.  *See* Final Consent Award, *Silverboys v. Jones*, (June 4, 2019).  Skordas was arrested for his role in this scheme in the Bahamas in October 2015, but subsequently fled and remains a fugitive.

### B.     Joelsson Falsely Holds Herself Out as a Licensed Designer

72.     In need of a new reputable and licensed designer to finish the design and construction projects on the Property, Mr. and Mrs. Silverman, the principals of Silverboys, were introduced to Joelsson in early November 2014 through a trusted friend.

73.     Joelsson, a former Miss Sweden and the self-proclaimed "Penthouse Queen" of South Beach, represented herself to Silverboys as a world-renowned interior designer based in Miami, Florida, with extensive experience managing high-end residential interior design projects through her company, SOJO.

74.     During these introductory discussions, Silverboys explained their experience with the Original Team to Joelsson and emphasized that they wanted to work with a licensed professional to assess the damages, fraud, and to finish the project on their Property.

75.     Joelsson represented to Silverboys that she was indeed licensed.

76.     Joelsson said that she took fraud seriously and presented herself as an empathetic partner who was uniquely situated to provide assistance because she, too, had been the victim of fraud perpetrated by her former bookkeeper years earlier.

77.     To confirm Joelsson's representations to Silverboys that she was a licensed designer, Joelsson sent an email to Silverboys on November 26, 2014, which attached a picture of

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

a license purporting to be issued by the State of Florida Department of Business and Professional Regulation in the name of SOJO DESIGN LLC.

78.     In truth and in fact, Joelsson was never a licensed designer.

79.     Indeed, the Florida Board of Architecture and Interior Design brought at least six successful disciplinary actions against Joelsson for offering interior design services in magazine advertisements and on her website without being licensed, twice in 2003 and again in 2004, 2007, 2010, and 2013.

80.     She was fined for the violation and, as the Board noted, Joelsson agreed not to offer interior design services in the State of Florida.

81.     Joelsson later claimed that SOJO was relying on the professional license of an individual by the name of Troy Verrett ("Verrett") – whom the Silvermans had never met nor heard of.

82.     However, according to a former SOJO employee, Joelsson paid Verrett a monthly fee of $2,500 to "use" his license for her company.

83.     In fact, Verrett did not work at SOJO's office and only provided architectural reviews for a handful of SOJO projects.

84.     According to the former employee, even when Verrett stopped providing architectural reviews of any SOJO projects, Joelsson continued to rely on Verrett's interior design license to falsely claim that she and her company were licensed.

### C.     Silverboys Engages Joelsson and SOJO

85.     Relying on Joelsson's representations regarding her licensure and her own history of being victimized by fraud, Silverboys engaged SOJO in late November 2014 to provide interior design services related to Silverboys' Property.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

86.     Joelsson also agreed to assist Silverboys in assessing the fraud committed by the Original Team, by acting as an expert witness in their upcoming litigations.

87.     Joelsson immediately undertook a review of the work performed to date on the Paradise Island Project to help her understand her role, the scope of work going forward, and the nature of how the Original Team had defrauded Silverboys.

88.     In this, Joelsson was provided with access to the Original Team's papers, which included all of the drawings, architectural plans, quotes from the Original Designer, bids from construction subcontractors, credits relating to mirrors and appliances that Skordas had stolen, inventory lists of items that were held hostage in the Original Designer's warehouse, and lists of all of the items that had been ordered or remained to be ordered.

89.     These papers detailed all of the pricing from the Original Team and quotes that were needed to complete the Paradise Island Project.

90.     Joelsson would utilize her access to these documents to design her own scheme to defraud Silverboys.

91.     Additionally, as set forth in more detail below, in January 2015, at the request of Joelsson, Silverboys extended the scope of Joelsson's work to include supervision of the architectural and construction work on the Property, thereby giving her complete control over all aspects of Silverboys' Project.

**D.     The Interior Design Contract**

92.     On November 18, 2014, SOJO sent Silverboys an engagement letter (the "Engagement Letter") providing an overview of SOJO's process for the work to be performed. SOJO also sent a proposed design agreement (the "Interior Design Contract"), which set forth the services to be performed.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

93.     The Engagement Letter provided that SOJO would "act as the Client's representative in the field" for the construction of the Project.

94.     Additionally, for non-custom goods to be purchased on behalf of Silverboys, the Engagement Letter represented as follows:  "To ensure that we provide the best price possible to you, for non-customizable pieces, we research a fair market value based upon an internet search to find the three lowest prices that you would be able to purchase the item for. Or, if these cannot be found, we will inquire into the manufacturer's suggested retail price. This will become your price and is inclusive of our purchasing fee. For customizable items, the purchasing fee is 30% of the supplier price."

95.     Pursuant to the Interior Design Contract, Silverboys would pay a monthly design fee of $15,000.

96.     In addition, for all goods or items to be purchased for Silverboys' Property, the contract was structured as a "pay as you go contract," meaning that Silverboys only paid SOJO when goods were purchased or ordered by SOJO.

97.     In other words, it was not a "retainer" arrangement, whereby the client pays a set amount upfront for the designer to use to purchase goods for the Project.

98.     The initial contract SOJO sent to Silverboys required that Silverboys deposit 75% of the cost of the goods at the time of the initial purchase, with the 25% balance due at the time of delivery.

99.     Following negotiations between the parties, Joelsson ultimately agreed in an email that Silverboys would be required to pay "whatever the vendor require[s] at the time [of purchase]."

100.    The parties executed the Interior Design Contract reflecting this arrangement on or

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

about November 25, 2014.

101.    The Interior Design Contract further specifically provided that SOJO was obligated to "[a]ct as [Silverboys'] purchasing representative, supervise receipt of items, coordinate delivery and installation, and prepare punch lists for all Merchandise and Interior Installations."

102.    On November 24, 2014, Joelsson established her Design Fee of $180,000 in the form of Proposal 0001 and provided wire payment instructions to Silverboys for her first installment of $15,000.

103.    The instructions listed the Bahamian residential address: SOJO Design LLC, 22 Blackbeard Terrace, P.O. Box CV12762, Nassau, Bahamas.

104.    Unbeknownst to Silverboys, Joelsson was providing the home address of an individual named Kevin Bain ("Bain"), Jones's subcontractor, on her wire.

105.    This means that within two weeks of meeting Silverboys, Joelsson had already connected herself with the same individuals that had previously defrauded Silverboys, and whose misconduct Joelsson had promised she would assist them in assessing and protecting against.

106.    When Bain was confronted on why his home address appeared on Joelsson's retainer, he said that he was promised the job by Jones and Skordas and then subsequently by Joelsson and that it was his understanding that Joelsson was the project manager.

107.    In November 2014, the Bahamian General Contractor was still undertaking construction work on the Project and BluePoint Construction ("BluePoint") was acting as Silverboys' Construction Manager and Owner's Representative.

108.    On December 10, 2014, Silverboys' US representative and trusted contractor, BluePoint, who was unraveling the fraud committed by Jones and Skordas demonstrated to Joelsson via email that they would be holding her accountable on her project timeline and

completion dates.

109.     Several days later, on December 15, 2014, Mrs. Silverman phoned Joelsson to reinforce the intentions and expectations of all purchases stating that they wanted, "all economical prefab," and that the top priority was getting the family into the Main House, to which Joelsson replied that she would "take this into consideration."

110.     On December 17, 2014, Jones walked off the site after being held accountable.

111.     Silverboys' assistant informed them that Jones had stolen project-related drawings from the ministry of work and was holding them hostage until he was paid the $1M Silverboys "owed him."

112.     Joelsson was immediately informed by email and responded, "Oh my I'm sorry," even though she had been working behind the scenes with Jones and his subcontractors since the third week of November, when she met Jones onsite.

113.     On December 22, 2014, Joelsson sent her employee, Mara Schwartz an email that stated, "I thought Karen was not copied on the team meetings."

114.     From this point on, Joelsson would demand that Silverboys be "kept off the site" and "out of all builder conference calls."

115.     Joelsson frequently commented about having to get Mrs. Silverman "off the site."

**E.     Joelsson Brings in a New Architect**

116.     With Jones thrown off the site, Joelsson needed a new Bahamian local to arrange fraudulent construction kickbacks on her behalf.

117.     On January 21, 2015, just two months after beginning Interior Design work on the Project, Joelsson directed her assistant and SOJO employee, Schwartz to write to Silverboys stating that she was concerned about the parties involved in the Project.

118.    Joelsson's email explained that the project management firm brought on by Silverboys to assess the status of the project from both a construction and financial perspective after Skordas' termination, BluePoint, was accustomed to working on commercial projects, not high-end residential projects, and that installing a local architect who was more familiar with the Bahamas made the most sense from the standpoint of budget, time, and safety.  Within days of this email, Joelsson presented a Bahamian architect, Robert Whittingham ("Whittingham"), to take over all of BluePoint's responsibilities.

119.    Joelsson assured Silverboys that she had "fully vetted" Whittingham, even though it would later be revealed that, at the time she made this statement, she did not know who he was.

120.    She described Whittingham as a person who was familiar with the local building codes and regulations, knew how to navigate importing goods through customs, and was friendly with all the right subcontractors.

121.    Further, since the Project was purportedly at a stage where it only needed the "finishes," Joelsson stated that she would work closely with Whittingham to ensure that the project proceeded in a timely and cost-efficient manner.  Silverboys later learned that SOJO created documents attributing expenses owed to Core before Core had even been engaged.

122.    Joelsson strategically manipulated Silverboys into allowing SOJO to retain Whittingham as a local SOJO representative to act as her agent and Core Construction to take over construction and work under SOJO Design.  On January 23, 2015, Joelsson sent Mrs. Silverman an email introducing Whittingham as her new "guy," who would be coordinating the remainder of the construction on-site and all trades.

123.    A few days later, Joelsson sent an email to Mrs. Silverman stating that in order for her to be as effective as possible, ***everything*** needed to go through her office and she needed "full

control" over the Project.

124.   As such, Joelsson took responsibility for overseeing Whittingham.  Whittingham, in turn, subcontracted Core, which was engaged to perform construction services for the Project.

125.   On January 27, 2015, the parties executed an addendum to the Interior Design Contract memorializing SOJO's expanded role and the hiring of Whittingham (the "Addendum").

126.   In exchange for taking on this new role, SOJO was to receive an additional fee of $5,000 per month for overseeing the construction side of the Project, which Joelsson insisted be paid through her entity and not directly to Whittingham.

127.   With Whittingham in place, the SOJO Defendants had now secured full control over both the interior design and construction of the Project.  As noted above, this was by design.

II.     **SOJO Immediately Diverts Silverboys' Money for Improper Purposes (Manipulation of Cash Requests and Proposals)**

128.   From the outset, Joelsson intended to misappropriate Silverboys' funds for her own improper purposes rather than to purchase or order the goods she represented she was purchasing on its behalf.

129.   As set forth in more detail below, the SOJO Defendants employed a deceptive web of "cash requests" and "proposals" for the purchase of items that were designed to obtain funds from Silverboys for her own use.

130.   Instead of using those funds for the purchase of the goods as represented, Joelsson immediately used those funds to pay off existing, unrelated liabilities.

131.   For example, between November 2014 and December 2015, SOJO obtained $1,722,371.

132.   During the same time frame, Joelsson made payments on her personal credit card debit totaling $1,722,781, a difference of $410.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

133.    The monthly credit card statements reveal it was used for purchases that were personal (such as $3,867.05 at "Hermes of Paris" and $468.55 at "Gulf Liquors Miami Beach"), and also for design or construction-related purchases that did ***not*** pertain to the goods that Silverboys ordered or the vendors from which SOJO purportedly purchased items for the Silverboys Project.

### III.    SOJO's Fraudulent Use of the Cash Requests to Overbill and Steal Money from Silverboys

134.    Joelsson and Coe engaged in numerous schemes designed to fraudulently obtain additional money from Silverboys.

135.    Specifically, Joelsson and Coe: (1) billed Silverboys twice for items and concealed the double-billing by (i) moving items from one numbered proposal to a different numbered proposal; (ii) bundling multiple items in a single proposal and subsequently invoicing Silverboys for the same items separately; (iii) billing Silverboys for the same item with a different reference number so that it appeared to be a different item; or (iv) giving the item a different description or name, so as to conceal the duplication; (2) billing Silverboys for items obtained from a vendor with whom Silverboys had a credit; (3) billing Silverboys for fictitious sales taxes; (4) instructing vendors to increase their prices after they provided initial quotes for goods; and (5) using a shell company to purchase non-custom goods and then representing to Silverboys that the goods were custom so that SOJO could apply a 30% fee that would otherwise not be authorized under the Interior Design Contract.

136.    When transmitting a cash request, SOJO did not include all prior versions of proposals, or even all of the proposals listed on the cover of the cash request.  SOJO also did not provide any notation identifying the extent to which items were added, removed, or modified.  This prevented Silverboys from comparing the contents of the proposals to identify what had already

been paid on, or whether the purportedly new cash requests were based on new goods at all.

### A. Changing Reference Numbers

137.     In one example of Joelsson changing reference numbers, in May 2015, Joelsson sent out Cash Request 5, requesting 60% on the included Proposal 0010's millwork items.

138.     Of the total charge, Joelsson collected $55,497 on Bon Vivant's custom vanities, even though Joelsson did not have any contracts, drawings, or purchase orders at this time.

139.      One month later, Joelsson extracted those items, moved them to Proposal 0012, changed the reference number, and charged an additional 90% on top of the 60% already paid, thus collecting 150% before she even knew the true cost of the items.

140.     Joelsson would not sign a contract with Bon Vivant for these items until August 30, 2015, after she had collected 150%.

### B. Commingling Funds

141.     Joelsson's former bookkeeper Melissa Echevarria, who was employed by SOJO during the time of the Silverboys Project, testified that Joelsson would commingle money paid to SOJO with moneys held by other companies owned by Joelsson.

142.     Specifically, Ms. Echevarria testified that Joelsson would transfer money from SOJO to other Joelsson-owned companies, such as Spa Ricci, LLC, a spa that Joelsson opened while the Silverboys Project was ongoing.

143.     Joelsson would disguise those transfers as a "loan."

144.     Additionally, SOJO would "loan" funds from SOJO to Cudesso, LLC, another Joelsson-owned entity that SOJO used to mark-up and then resell goods and materials to its customers.

145.     However, Ms. Echevarria, who was responsible for maintaining the books of these other entities, was not aware of any repayments of these purported "loans."

146.    As a result of Joelsson's and SOJO's conversion of Silverboys' funds, SOJO experienced cash flow problems, and was unable to purchase goods for the Silverboys' Project.

147.    Indeed, in one e-mail dated November 3, 2015, a designer working on the Silverman Project complained that "[t]here is no money for Silverman."

148.    By this time, Silverboys had provided many hundreds of thousands of dollars to SOJO for the alleged purchase of products from vendors but SOJO retained, rather than forwarding on to vendors, a significant portion of that money.

149.    To cover the shortfall of funds caused by the conversion, SOJO, through Joelsson and Coe, submitted multiple cash requests to Silverboys, seeking overpayments on goods for which Silverboys had previously paid.

150.    For example, SOJO, through Joelsson and Coe, sought and collected 150 percent of the value of certain goods through multiple cash requests.

151.    In addition, Joelsson and Coe sought payment for non-existent shipping, installation, and fabrication charges.

152.    SOJO's requests for large amounts of cash from Silverboys were accompanied by Joelsson's promises that the project would be completed by a date certain.

153.    When making these promises, Joelsson knew the project could never be completed as scheduled because, for example, SOJO had not made the necessary payments to multiple vendors and failed to approve many drawings that were necessary to fabricate the goods.

154.    Joelsson made these promises to induce Silverboys into parting with even more money.

155.    Aside from causing SOJO to scramble for funds, this conduct of misusing funds also resulted in substandard work and significantly delayed the completion of the Project, all of

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

which caused damages to Silverboys.

156.    Nevertheless, SOJO, Joelsson and Coe, by various means, repeatedly and knowingly falsely assured and represented to Silverboys that the Project would be completed on time by October 2015, later changing this date to November 2015.

157.    Joelsson intentionally extended the length of the Project to garner more monthly fees and prolong the opportunity to extract money from Silverboys.

158.    On July 20, 2015, Joelsson wrote to Coe explaining that the Project "is not really moving forward on our end."

159.    The same day, SOJO's internal project status update included, "[h]ave [a] meeting with designers and figure out how to finish project," among the remaining items for the Project.

160.    Less than two hours later, Joelsson wrote to Silverboys and said that she was "happy to tell you [Silverboys] that the houses are coming along great and you can really start seeing the project and the site is cleaned up and neat . . . As always I have a long list to move along but you can really start seeing the final product and it's going to be very nice."

161.    On July 25, 2015 Joelsson responded to a status inquiry by Silverboys, saying that moving in by October 2015 was "very doable!"

162.    Separate and apart from this conduct, one of the Silverboys designers assigned to this Project said that she was instructed by Joelsson, and "probably" Coe as well, to mark-up by 30 percent every single item – custom or non-custom – that SOJO sold to Silverboys.

163.    These instructions from Joelsson and Coe came after, and were contrary to, Joelsson's and Coe's express promise to Silverboys that it would only mark-up custom goods.

164.    In addition to the extra 30 percent, that same designer said that she was instructed – once again by Joelsson – to go back to a vendor and tell them to increase their price quote to

SOJO by 10 percent, which was reflective of a $20,000 increase in that particular instance.

165.     While that designer did not know why Joelsson wanted the prices inflated, and was simply "doing what [she] was told" by Joelsson, a separate designer said that, with at least some vendors, it was not unusual that SOJO would demand and receive referral fees or discounts from the vendors.

### C.     Fraudulent Referral Fees

166.     Joelsson's internal communications also reflect her efforts to extract additional revenues from Silverboys for use in unrelated projected.

167.     For example, in one communication Joelsson recognized a revenue shortfall in connection with an unrelated projected, and suggested increasing charges to Silverboys to cover the difference.

168.     Specifically, Joelsson wrote in an email:  "Javier, The guys are working on the rooftop again today….So with the planters and boxwood, we are a bit over 8K in materials, I only rec'd 10K for labor so far from o/c [Ocean Club Estates, the location of the Silverboys project], so hopefully Chayanne can get more funds, so we can finish rooftop [T-1 : Tim Headington] and move downstairs [Spa Ricci]."

169.     Richard Beauregard, Joelsson's former landscaper and subcontractor of 10 years, said "After I received the Silverman's payment, Ms. Joelsson demanded that $10,000 of that payment be applied in plants to her personal penthouse owned by Headington Realty and Capital in exchange for the work we were doing for the Silverman Project."

170.     Beauregard has provided a copy of a check dated April 28, 2010 showing a referral fee kickback to SOJO.

171.     A former SOJO employee has said that "Sofia would pay the vendor in full and then the vendor would cut them a check with the referral fee."

27

172.     Joelsson also invoiced referral fees to Bon Vivant and Visser Closets totaling $175,135.45.  In addition, Joelsson charged the Silverboys for items not related to the Silverboys project, and took items that were intended for Silverboys and used those items on other projects.

**D.     Manipulation of SOJO's Project Management Software**

173.     A critical representation Joelsson made to the Silvermans before Silverboys engaged SOJO was that SOJO had a "state-of-the-art" billing system that would prevent the type of fraudulent billing practices that Silverboys experienced with the Original Team from happening with SOJO.

174.     SOJO did in fact possess such an accounting system, called "Design Manager," which was capable of safeguarding against fraud.

175.     Indeed, Design Manager can track every component of every room for a given project, tracking all associated costs and allowing an interior design firm to quickly generate client proposals, purchase orders, and invoices.

176.     But Joelsson and Coe avoided using Design Manager so they could carry out the fraud.

177.     According to a former SOJO employee, "instead of using Design Manager to print payment requests, or cash requests, Mr. Coe manually created new spreadsheets, using software other than Design Manager, and he manually entered information into those spreadsheets."

178.     SOJO employees found it strange that Coe, rather than using Design Manager's internal functions and capabilities, chose to use separate software to generate his manually created cash requests.

179.     In fact, Joelsson and Coe created an extra set of books outside of Design Manager and overrode the protections built into the system.

180.    The result is that cash requests were not sequential, reference numbers were altered from cash request to cash request, and markups were altered in the system.

181.    Joelsson and Coe would then generate their own invoices from Excel spreadsheets that would contain altered information.

182.    They would from time to time then go back into Design Manager and alter entries in order to get them to conform to their spreadsheets.

183.    Joelsson and Coe deliberately manipulated the Design Manager system and created a set of cash requests and invoices outside that system to help steal Silverboys' funds.

184.    Joelsson's and Coe's deliberate manipulation of the Design Manager system and creation of a set of cash requests and invoices outside that system further demonstrate their deliberate and calculated efforts from the outset to steal Silverboys' funds.

**E.      SOJO Defendants Inflated Amounts Due on Cash Requests by Adding Fraudulent Sales Tax**

185.    Because the items and services affiliated with the Project were Bahamas-bound, no United States sales tax was due or owing, and therefore none needed to be collected.

186.    Instead, Silverboys would pay a 45% duty plus a 7% VAT tax to the Bahamian government.

187.    Notwithstanding no US sales tax was due, Coe and Joelsson sent a number of cash requests to Silverboys which fraudulently charged US sales tax.

188.    For example, on January 15, 2014, Coe sent an email to Ms. Silverman, with a copy to Joelsson, attaching a cash request labeled as Cash Request 4.

189.    Even though an earlier cash request had reflected no sales tax on the same proposal, Cash Request 4 *did* include a sales tax amount.  Specifically, Proposal 0002 reflected goods in the amount of $14,329.73, which included a separate sales tax line item in the amount of $848.94.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

190.    Similarly, on February 17, 2015, Coe sent an email attaching Cash Request 3 to Silverboys, which included a total sales tax charge of $25,886.05 (although it is unclear from the proposal which items accounted for the sales tax, or if it was for all the items listed).

191.    Further, on March 17, 2015, SOJO sent a cash request to Silverboys containing a sales tax charge of $4,979.34.

192.    Silverboys paid on these cash requests, which included whatever percentage of the sales tax the vendor was purportedly demanding for the item listed.

193.    Through this deceptive device, Silverboys paid SOJO for sales taxes that were never in fact owing on the items purchased.

**F.    Use of Cudesso to Inflate Charges Billed to Silverboys**

194.    Cudesso is an on-line "curated living" store owned and controlled by Joelsson.

195.    The SOJO Employee Manual instructed SOJO's employees to obtain goods (furniture, rugs, art, lighting, tableware, etc.) for projects through Cudesso.

196.    SOJO paid the salaries of Cudesso's employees and covered the costs of operating Cudesso's website.

197.    SOJO employees were required to seek Joelsson's permission to purchase goods for any design projects from any place other than Cudesso, and Joelsson pressured SOJO's employees to directly market Cudesso's "products" to clients.

198.    Joelsson and SOJO purchased non-custom, low-cost, low-quality items through Cudesso, even though those same items could have been purchased directly by SOJO from the same sources.

199.    Cudesso would then resell those same items to SOJO at a markup, and SOJO would provide invoices to Silverboys and other clients reflecting the inflated price charged by Cudesso.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

200.    This practice allowed Joelsson to pocket Cudesso's markup and conceal the true price of items used in the Paradise Island Project.

201.    For example, documents produced in discovery show that Cudesso ordered non-custom goods from a company named All Modern for a price of $6,386.82.

202.    Cudesso then billed SOJO, and therefore Silverboys, $8,370 for the same goods.

203.    As a result, SOJO roughly paid Cudesso a 30% markup for non-custom goods that could have been purchased directly from All Modern.

204.    Instead, SOJO used Silverboys' funds to pay what it knew was an inflated price for goods.

205.    Similarly, Cudesso ordered non-custom goods from a company named Modloft for $555.50.

206.    Cudesso then charged SOJO, and therefore Silverboys, $1,200 for the same items.

207.    Consequently, in this prior example, SOJO paid Cudesso a markup of more than 100% for non-custom goods that SOJO could have purchased directly from the same source. But SOJO instead purchased the items through Cudesso at a price that it knew or should have known was artificially inflated.

## IV.    Methodologies of Fraud

208.    Joelsson used several means of fraud, including the manipulation of cash requests, proposals, and invoices, as detailed in examples set forth below.

209.    On December 18, 2015, Coe emailed Cash Request 3 asking for a second retainer fee of $15,000.

210.    Joelsson increased proposal 0002 in Cash Request 3 by adding a fraudulent sales tax of $835.65.

211.     Furthermore, in cash request 3, Joelsson noted a total design fee of $180,000, the agreed contractual amount, and added $14,727.38 (a balance on the Staff House costs remaining).

212.     This $194,727.38 total budgeted amount would be recycled and rebilled three months later, relying on completely different itemized goods as a fraudulent new budgeted increase amount calculated between Cash Request 5 and Cash Request 6.

213.     This same figure reappears on September 11, 2015 on SOJO's filed sales tax report for the month of August, solely attributed to Bahamas-bound goods and services (which were never delivered) such that the income represented would not be subject to tax.

214.     These items listed, although designated for Silverboys, were in fact used on other clients' projects, further allowing Joelsson to steal additional funds through sales tax from these clients.

215.     Joelsson executed a scheme to steal funds from Silverboys continually utilizing a confusing mix of cash requests, proposals and construction invoices.

216.     Joelsson caused Silverboys to wire her $857,000 from November 2014 to August 2015—a period during which only approximately $32,000 of material goods had been ordered.

217.     Joelsson simply diverted that sum to her e-commerce shell company, Cudesso, which would show a total revenue of $857,000 for the fiscal year of 2015.

218.     The "SOJO Version: Cash Request 6" created on February 11th listed Proposal 0001 Design Time not for the contractually agreed amount of $180,000 for 12 months, but at a raised cost of  $430,000; a fraudulent increase of $250,000.

219.     On the "SOJO Version: Cash Request 3", the reconciliation template cover had totally removed Proposal 0001, with its phony design time of "$430,000."

220.     Joelsson rolled this amount into Proposal 0003, as "Main House Items," deceiving

Silverboys into giving a large sum of money, which she would re-bill it for (in almost the exact amount) nine months later, on November 6, 2015, when Joelsson sent a series of invoices totaling $430,000.

221.    Silverboys also discovered that Joelsson utilized a second set of books that further demonstrate the fraud on Silverboys.  Specifically, Joelsson was only authorized under a single project, labeled SIL01.  But in a second set of books, which Joelsson labeled "SIL02," she charged Silverboys for phantom construction services that never occurred and materials that were never delivered. By March 2016, Silverboys started to demand supporting documentation and closely reviewed prior cash requests and proposals.

222.    As vendors and subcontractors continued to invoice SOJO for work that Silverboys had already paid for and knowing that the corresponding funds had already been spent or moved, the SOJO Defendants' anxiety intensified.

223.    When one vendor requested payment, Coe wrote an email to Joelsson providing a frank assessment of the SOJO Defendants' predicament: "We are [f#! ked]."

224.    After weeks of excuses and delays, Silverboys terminated the Agreement for cause.

225.    Silverboys continued to make demands to account for how their funds were spent.

226.    On or about May 11, 2016, Joelsson delivered more than 200 pages of documents which bore no resemblance to any previously received statements by Silverboys.  Joelsson not only stole millions from Silverboys through design and construction but left their property in the Bahamas in an even more dangerous condition.  For example, Joelsson charged Silverboys for a non-slip tile that was to be installed around the pool area.  This tile was never installed or delivered.  Then, Joelsson charged Silverboys a second time for a cheaper tile that did not have non-slip qualities, which Joelsson had installed around the pool (and thus creating the dangerous condition).

### V.    Concealing the Fraud

### A.    Other Features of Cash Requests Designed to Mask SOJO's Fraud

227.   The specific examples of fraud described above are only a sample of the different means by which Joelsson perpetrated her overall fraud to obtain money from Silverboys through deceit.

228.   SOJO employed many other deceptive means to confuse and conceal its fraudulent billing of Silverboys.

229.   The cash request covers failed to provide running balances of what had already been paid and failed accurately to record (as credits to Silverboys) amounts that Silverboys had wired to SOJO.

230.   In some cases, the credit for a wire appeared on an earlier version of a cash request cover but was deliberately removed in a subsequent cash request cover.

231.   For example, Cash Request 4, sent from SOJO to Silverboys on or around January 15, 2015, identified two wire payments from Silverboys for $15,000 each on November 26, 2014 and January 8, 2015.

232.   On February 17, 2015, SOJO sent Silverboys Revised Cash Request 3 with a cover that listed some previous wire payments but omitted the November and January $15,000 payments.

233.   Additionally, the math on the cover of the cash requests was typically incorrect and inconsistent with the attached proposals.

234.   For example, on March 17, 2015 SOJO sent Silverboys Cash Request 4, requesting 60% of the $83,262.93 budgeted for Proposal 0009.

235.   However, 60% of that amount is $49,957.76, not the $50,079.50 that SOJO requested and Silverboys paid.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

236.     These discrepancies made it impossible for Silverboys to keep track of the money they spent and indicate that SOJO was frequently sending cash requests and proposals that contained fictitious prices.

237.     In addition to incorrect calculations on the cover of Cash Requests, Joelsson changed the value of proposals without ever ordering an item.

238.     For instance, the first version of proposal 0003 from Cash Request 6 created on February 11, 2015, was valued at $83,645.94.

239.     Joelsson increased the budgeted amount on this proposal to $503,961.67 by June 29, 2015, which was an increase of $420,315.73, while she had yet to order a single item.

**VI.     SOJO Manipulated Vendor Invoices to Further the Fraud**

240.     SOJO worked with vendors and manipulated their invoices as part of its scheme to overbill Silverboys.

241.     SOJO maintained two sets of invoices for goods purportedly purchased from vendors: one set of the invoices (which was fabricated) would be sent to Silverboys, and one set was maintained to keep track of the prices the vendors actually charged SOJO for the goods.

242.     At times, Joelsson or another SOJO employee specifically asked certain vendors to provide two separate invoices, one with higher prices.

243.     For other vendors, SOJO demanded that they provide the electronic template for the invoices so that SOJO could populate the invoice itself.  Upon information and belief, this practice is not standard for the design industry.

244.     Multiple versions of purchase orders, proposals, and invoices have been found for nearly every vendor or subcontractor.

LEÓN COSGROVE, LLP

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

245.    Further, a March 23, 2016 email from SOJO employee Julie Wolf ("Wolf") revealed a message to Joelsson that read, "This is the original quote," referring to a quote from Visser. Wolf then writes, "I'll be sending the SOJO quote to you shortly."

246.    Consistent with this practice of utilizing two separate invoices, a former bookkeeper testified that Coe would maintain a separate set of or accounting records on his computer that were maintained separate and apart from SOJO's standard accounting system.

247.    In November 2015, Visser submitted two versions of an invoice to SOJO for installation and travel expenses relating to a wardrobe and dresser.

248.    One version showed the total cost as $3,750.00; the other showed the same exact items at a cost of $5,100.

249.    Ultimately, SOJO sought and was paid $5,750 to cover the last of the wardrobe and dresser as well as an additional $1,000 in crating that was never otherwise mentioned.

250.    In another Visser-specific example, in February 2015, the SOJO Defendants submitted a purchase order to Visser for a collection of closets for the Guest House for $11,600 and a collection of closets for the Main House for $38,800, for a combined cost of $50,400.

251.    Visser generated two invoices with the same date.

252.    One version showed that the total cost for all closets was in fact only $38,800, and the $54,400 figure included installation and travel expenses.

253.    The other version omitted any reference to installation and travel expenses Visser had instead inflated the cost of the closets to reach $54,400.

254.    That same month, Coe emailed Schwartz to complain about a purchase order she prepared that itemized the cost of installation, stating that this was the "incorrect way" to prepare a purchase order, and doing it that way would "ruin the process when it comes to invoices."

255.    All in all, Silverboys paid approximately $131,133 to SOJO in connection with items and services provided by Visser.

256.    The entire amount is tainted by the established pattern of Visser and the SOJO Defendants working together to inflate prices and duplicate expenses, then generating fraudulent documents that were provided to Silverboys.

257.    Visser manipulated numbers and generated multiple versions of invoices at the direction of the SOJO Defendants.

258.    In addition, Silverboys would discover an invoice from Visser showing that budgeted amounts for items on the Paradise Island Project—as well as SOJO projects for other clients—built in a 10% referral fee that was paid to SOJO.

259.    This arrangement was never disclosed to Silverboys.

260.    In another example, Total Windows and SOJO executed a contract dated August 11, 2015, for foyer decorative drapery hardware totaling $7,645.00.

261.    Subsequently, on September 29, 2015, Total Windows provided a quote for the same hardware totaling $1,218.70.

262.    SOJO sent Silverboys a cash request indicating that the price of the hardware was $9,938.50.

263.    On September 4, 2015, Silverboys wired SOJO the full marked-up price for the hardware.

264.    At no point did Silverboys see the original Total Windows invoice for $1,218.70.

265.    Another company, Fine Surfaces, was retained to provide and install custom countertops for the Property.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

266.     Fine Surfaces, at the direction of SOJO, falsely inflated the cost of materials used for the countertops and the cost of installation to conceal secret kickbacks to the SOJO Defendants.

267.     For example, Fine Surfaces charged Silverboys $155.00 per square foot to install a 214 square foot kitchen countertop.

268.     The industry standard for fabrication and installation of such a countertop is $40.00 per square foot.

269.     Fine Surfaces generated multiple versions of invoices for the Paradise Island Project and thereby facilitated SOJO's fraudulent billing.

270.     SOJO conspired with Fine surfaces to collect on extra slabs to be used for Tim Headington's rooftop.

271.     On July 28, 2015, Joelsson received an invoice denoting 12 slabs at a net cost of $980, totaling $1,274 for the client's total cost.

272.     However, the next day Joelsson sent out cash request 6 with ten of the slabs listed at a unit price of $1,486.33 and two others listed at $1,592.50.

273.     Joelsson overcharged Silverboys to cover for extra material.

274.     Documents show that the payment to Fine Surfaces included a memo of, "SIL01 and Headington."

275.     Silverboys did not receive the slabs until April of 2016, after Joelsson was thrown off their site.

276.     In another example, on January 7, 2015, Bon Vivant sent SOJO a quote for some custom millwork items.

277.     The quote included a front door entry that was priced at $31,976.00.

278.    On February 17, 2015, SOJO sent Cash Request 3, which attached Proposal 0003, to Silverboys.

279.    The front door was included in Proposal 0003 and reflected a price of $41,568.80.

280.    On February 19, 2015, Silverboys wired SOJO the funds for Cash Request 3.

281.    A few days later, on February 23, 2015, Bon Vivant sent SOJO an additional quote for the front door pricing the item at $37,250.00.

282.    After receiving the $37,250.00 quote on February 23, 2015, SOJO submitted a purchase order to Bon Vivant for the front door (reference number 0161) for $31,976.00.

283.    In so doing, SOJO paid $5,274.00 less than the price indicated on the quote SOJO had most recently received from Bon Vivant.

284.    This is because the higher quote was not intended for SOJO at all but was provided so that SOJO could justify the price it charged later with an invoice if Silverboys ever requested backup.

285.    On August 28, 2015, SOJO requested payment on the "balance" for the front door in Cash Request 7, Proposal 0003.

286.    The proposal listed a price for the front door of $48,425.00.

287.    On September 4, 2015, Silverboys paid Cash Request 7 in full.

288.    Therefore, by September 4, 2015, SOJO had purchased the front door for a price of $31,976.00 based on the lower vendor quote.

289.    However, SOJO billed Silverboys for $48,425.00, a price that could be justified (if at all) only by the second, higher vendor quote.

290.    In the end, Silverboys paid $23,413.00 more than SOJO had paid for the front door.

291.    To further compound Joelsson's theft, Joelsson separated out the material and

LEÓN COSGROVE, LLP

255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

charged Silverboys on cash request 6 for resysta and staining, all while knowing the material came with the custom front door.

292.     Joelsson, in fact, never purchased the resysta material for the front door and stole the $16,000 received from cash request 6 proposal 0013.

## VII.     SOJO Employed a Fraudulent Billing Scheme to Steal Credits, Items, and Funds

### A.     SOJO Converts Silverboys' Credits for Appliances

293.     Prior to Joelsson and SOJO taking over the Paradise Island Project, Silverboys had purchased $112,415 in appliances for the Paradise Island Project from Lieberts Royal Green Appliance Center ("Lieberts") in New York, New York.

294.     Those appliances were purportedly stolen in transit, and Lieberts agreed to provide Silverboys with a credit to repurchase the appliances at a later date.

295.     Silverboys informed Joelsson and SOJO about the credits, and SOJO arranged for Lieberts to place the credits in SOJO's name without Silverboys' knowledge or consent.

296.     On December 10, 2014, a representative of Lieberts contacted Joelsson and Schwartz to provide a schedule of the appliances that had been purchased as well as delivery charges.

297.     The schedule also included detailed notes indicating where each appliance was to be installed on the Property and showed that appliances were to be installed in the main house, guest house, staff house, and in the pool area.

298.     The February 11, 2015 internal version of Cash Request 6 indicates that a Lieberts refrigerator ($4,750.00), Fischer Paykel dishwasher drawer ($650.00), Bosch convection microwave ($1,225.00), Whirlpool laundry washer ($925.00), and Whirlpool laundry dryer ($925.00) were all to be purchased for the Guest House "against credit with Lieberts NYC."

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

299.    On February 12, 2015, Joelsson emailed Schwartz to point out that the February 11, 2015 internal Cash Request 6 did not include an extended price for any of the appliances.

300.    Schwartz explained that this was because those appliances were to be purchased using the Lieberts credit to which Joelsson responded that all of the appliances without an extended price should be removed.

301.    On June 15, 2015, a SOJO designer named Gabriella Carusone emailed Joelsson to discuss the appliances.

302.    Ms. Carusone noted that she was "trying to figure out which appliance company [Silverboys] has a credit with, as it's not the same company that Robert [Whittingham] is using."

303.    She further complained that the company selected by Whittingham "does not have anything we can use" for the Guest House.

304.    In addition, the email revealed that the company was being used to provide a laundry washer and dryer for the Staff House.

305.    In other words, SOJO was not using the Lieberts credit to replace the appliances even though they knew it existed, and Joelsson and Whittingham were instead purchasing those appliances from a local company in the Bahamas.

306.    On August 4, 2015, SOJO submitted a revised version of Cash Request 6 to Silverboys.

307.    Therein, under Proposal 0013, SOJO listed the same appliances for the Guest House that were previously listed in the February 11, 2015 internal Cash Request 6, indicating that payment was required from Silverboys and omitting any reference to the Lieberts credit.

308.    The cost of each appliance included a 30% markup from their original costs, even though these items did not qualify as "custom" and no commission should have been charged given

41

that the SOJO Defendants played no role in identifying these items or negotiating the prices.

309.   In other words, SOJO was not only charging Silverboys for the Guest House appliances despite the fact that they were covered by the Lieberts credit, but SOJO was inflating the price of those items to collect a secret commission.

310.   On August 6, 2015, a SOJO employee sent an email to Coe and another SOJO employee directing them to "[r]emove [Leiberts] from SIL01 [Silverman] Proposal 0013 and place POs [Purchase Orders] in separate file on computer and delete POs from DM [Design Manager]."

**B.    Other Stolen Items**

311.   Joelsson would also steal hardware purchased by the prior designer, using it on one of Headington's properties.

312.   When Silverboys asked Joelsson if she could confirm that a particular hardware was on site on June 12, 2015, Joelsson replied, "we have 14 boxes of hardware but did not go through each one of them but seems like we have them...Gabi, pls check the inventory list to compare."

313.   Twenty minutes later, Joelsson forwarded the email from Silverboys to Priscilla Steel stating, "Hardware we can use for Headington pulling up picture now."

**C.    Commingled Clients and Bundled Contracts - Additional Stolen Items**

314.   Joelsson not only used Silverboys' funds and materials for Headington projects, but also for other clients.

315.   She and her co-conspirators (Bon Vivant, Total Windows, Fine Surfaces, Visser, and Cudesso) would provide supporting documents including but not limited to quotes, checks, and contracts that show how they bundled clients together under the Silverboys' account.

316.    For example, Joelsson created a contract with Bon Vivant combining addresses of both Silverboys as well as a project she was working on at the same time in Miami.

317.    The contract reads "This agreement is made this 3rd day of September 2015 between Bon Vivant, Corp. (seller) of 120 N.E. 27th Street, Miami, Florida 33137, and SOJO Design (buyer) 1451 Ocean Dr. Miami Beach, FL 33139.  The project location is Pulley residence at Ocean club estates lot 321 Collins Drive Apt #200, Miami Beach, FL 33139."

318.    The contract described above was written to include both Silverboys and Pulley's combined and codified addresses; Silverboys' property address was Ocean Club Estates Lot 116 & 117 while Pulley's was 321 Collins Ave.

319.    This combination strategy occurred again when Total Windows labeled a section of Silverboys' invoice as "Silverman Patio Main," which really stood for the "Main Patio" of Joelsson's Sagaponack project, which would receive the exact same window treatments; Silverboys only had South Patio drapery, which was a separate item from this one and was never agreed to.

320.    Joelsson repeated this with two other vendors, combining Silverboys with Headington (Fine Surfaces) and then Pulley (Bon Vivant) on those checks.

### COUNT I:  FRAUD IN THE INDUCEMENT
### (Against Joelsson and SOJO)

321.     Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

322.    Joelsson and SOJO made repeated false statements and omissions of material fact. Prior to entering into the Interior Design Contract, Joelsson and the SOJO expressly represented to Silverboys that Joelsson was a licensed designer, that Joelsson and SOJO would assist Silverboys with assessing the fraud  perpetrated by the former designers including Joelsson serving

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

as an expert witness, and that SOJO had a sophisticated system in place (Design Manager) to prevent fraud.

323.    At the time these false statements and omissions were made, Joelsson and SOJO knew that they were false. Joelsson was not a licensed designer. Joelsson and SOJO did not intend to assist Silverboys with properly assessing the former fraud, nor could Joelsson serve as an expert witness in the upcoming arbitration, as she was not a licensed designer. Joelsson and SOJO never intended to use Design Manager in the manner they represented, instead they carried out a practice of manipulating bills outside of Design Manager.

324.    Further, prior to executing the Addendum to the Interior Design Contract, Joelsson and SOJO expressly represented to Silverboys that Joelsson was concerned with the performance of the then-current construction company, and suggested and represented that Whittingham and Core Construction would be more effective. Joelsson and SOJO represented that, if Silverboys increased their fee, they would provide supervisory services to oversee and ensure Whittingham and Core Construction were providing satisfactory services.

325.    At the time these false statements were made, Joelsson and SOJO knew that these statements were false. Joelsson and SOJO had no basis for their "concerns" that the then-current construction company performed inadequate services. Joelsson and SOJO did not intend to oversee and ensure the adequacy of Whittingham and Core Constructions services.

326.    Joelsson and SOJO intentionally made the false statements and omissions of material fact alleged above in order to induce Silverboys to enter into both the Interior Design Contract and the Addendum thereto.

327.    Silverboys relied on the false statements and omissions. Silverboys would never have knowingly agreed to pay Joelsson and SOJO for the services of an unlicensed designer, using

multiple billing systems, who would not diligently supervise the construction work performed on the Property.

328.    By relying on the false statements and material omissions, Silverboys suffered injury.

**WHEREFORE**, Silverboys requests judgment in its favor and against Defendants SOJO and Joelsson for compensatory and punitive damages, together with interest, costs and such other relief as this Court deems just and appropriate.

## COUNT II:  FRAUD
### (Against SOJO Defendants)

329.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

330.    As alleged above, separate and apart from the work covered by the Agreement, SOJO Defendants expressly represented that with each cash request, invoice, or proposal that (a) the prices stated therein were true and correct, (b) all amounts paid by Silverboys would be utilized to purchase the goods and services its project and for no other purpose, and (c) the referenced goods or services had already been received or would be received.

331.    SOJO Defendants knew that Silverboys would interpret each cash request, invoice, or proposal in this way.

332.    When making representations about cash requests, invoices, or proposals, the SOJO Defendants knew that those requests, invoices, or proposals contained false statements and withheld information.

333.    These false statements and material omissions were material.

334.    The SOJO Defendants made false statements and withheld information for the purpose of inducing Silverboys to rely on those false statements and omissions.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

335.    Silverboys relied on SOJO Defendants' material false statements and omissions. Because of that reliance, Silverboys suffered an injury and paid approximately $2 million for the purchase of goods and services.

336.    In addition, the SOJO Defendants misrepresented the status of the Silverboys Project.

337.    The SOJO Defendants misrepresented the status of the project in order to induce Silverboys to continue making payments to them.

338.    The SOJO Defendants' misrepresentations regarding the project status were material.  Silverboys relied on those misrepresentations and continued making payments to the SOJO Defendants.

**WHEREFORE**, Silverboys demands judgment in its favor and against SOJO Defendants for compensatory and punitive damages, together with interest, costs, and such other relief as this Court deems just and appropriate.

### COUNT III:  AIDING AND ABETTING FRAUD
### (Joelsson, Coe, Cudesso, and Vendor Defendants)

339.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

340.    Joelsson and Coe were each directly involved in drafting, reviewing, editing, and/or disseminating falsified cash requests, invoices, or proposals.

341.    They knew, or should have known, these representations were false, misstated the true price, and/or the underlying items and services had not been provided (or had not been provided in full).

342.    In addition, Joelsson and Coe knew that Silverboys' funds were being misappropriated from SOJO and Silverboys' accounts and used for expenses that were unrelated

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

to the Project.

343.   They also knew that Silverboys' payments were not retention fees and were deposited to be held in trust and exclusively used for Silverboys' benefit.

344.   Vendor Defendants and Cudesso each knew that their invoices did not accurately state the price and/or quantity of items or services.  They also knew, or should have known, that it was improper for SOJO to instruct them to inflate the cost of items or services, include secret commissions or kickbacks, and that payments had been received for items or services that had never been provided.

345.   Joelsson, Coe, Cudesso, and the Vendor Defendants all knew of SOJO's and Joelsson's fraud, and actively participated and provided substantial assistance and encouragement.

346.   Each time one of the Defendants falsified cash requests, invoices, or proposals, or knowingly approved the dissemination of the same, they committed a discrete act of wrongdoing that aided and abetted that fraud.

347.   As a direct and proximate result of the Defendants' acts, Silverboys suffered monetary damages in an amount to be determined at trial.

**WHEREFORE**, Silverboys requests judgment in its favor and against Joelsson, Coe, Cudesso, and Vendor Defendants for its damages, together with interest, costs and such other relief as this Court deems just and appropriate.

### COUNT IV: BREACH OF FIDUCIARY DUTY
### (Against SOJO)

348.   Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

349.   Pursuant to the terms of the Agreement, SOJO agreed to act as Silverboys "purchasing representative." Further, by executing the Agreement, SOJO was an agent of

Silverboys regarding the provision of onsite construction and interior design services.  As SOJO was an agent of Silverboys, SOJO assumed fiduciary duties, including the duty of fidelity or loyalty, the duty of disclosure, and the duty of good faith.

350.    In addition, SOJO had access to Silverboys' operational account and transferred Silverboys' funds into a client deposit account under SOJO's exclusive control.  Thus, SOJO was placed in a special position of trust and confidence giving rise to fiduciary duties, including the duty of loyalty, duty of care, duty of disclosure, and the duty of good faith.

351.    SOJO breached its fiduciary duties to Silverboys by committing the following acts: (i) overbilling for items and services that were received; (ii) concealing overcharges, secret commissions, and kickbacks; (iii) conspiring with Vendor Defendants and others to inflate prices and overbill Silverboys; (iv) misappropriating funds belonging to Silverboys; (v) misappropriating personal property belonging to Silverboys; (vi) engaging in self-dealing transactions without disclosure; (vii) submitting falsified invoices, proposals, and/or cash requests; and/or (viii) failing to adequately supervise and/or manage the Project.

352.    As a direct and proximate result of these breaches of fiduciary duty, SOJO unjustly enriched itself and caused Silverboys to suffer monetary damages in amounts to be determined at trial.

**WHEREFORE**, Silverboys requests judgment in its favor and against Defendant SOJO for its damages, together with interest, costs and such other relief as this Court deems just and appropriate.

### COUNT V:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Joelsson, Coe, Cudesso, Vendor Defendants)

353.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

354.    Joelsson, Coe, Cudesso, and Vendor Defendants each knew that SOJO was acting a purchasing representative (*i.e.*, agent) on behalf of Silverboys.  As a result, each knew, or should have known, that SOJO owed fiduciary duties to Silverboys.

355.    For the same reasons detailed in paragraphs of Count III (aiding and abetting fraud) above, the Defendants substantially assisted and encouraged SOJO's fraud and the breach of its fiduciary duties to Silverboys.

356.    As a direct and proximate result of the relevant Defendants' conduct, Silverboys suffered monetary damages in an amount to be determined at trial.

**WHEREFORE**, Silverboys requests judgment in its favor and against Joelsson, Coe, Cudesso, Vendor Defendants for its damages, together with interest, costs and such other relief as this Court deems just and appropriate.

## COUNT VI:  BREACH OF CONTRACT
### (Against SOJO)

357.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

358.    The Interior Design Contract and Addendum incorporated into and amending the Interior Design Contract constitutes a legally valid, binding, and enforceable contract between SOJO and Silverboys.

359.    As set forth in detail above, after inducing Silverboys to execute the Interior Design Contract, SOJO breached the Interior Design Contract.

360.    Specifically, pursuant to the terms of the Interior Design Contract, SOJO agreed to perform certain work at a flat, monthly rate, and to charge "all items purchased for the Client…at the Designer's cost" plus a 30% markup for "custom merchandise."

361.     The work covered by the Interior Design Contract included designing all interior and exterior details, obtain competitive bids for certain merchandise, and supervise receipt and delivery of items.

362.     Additionally, the work covered by the Addendum included supervision and onsite management of the Project and construction.

363.     SOJO materially breached the Interior Design Contract because it, among other things: (i) failed to charge Silverboys amounts in compliance with the terms of the Interior Design Contract and Addendum, and instead overcharged Silverboys; (ii) sought and received cash deposits and wires from Silverboys for items and services that were never received; (iii) improperly billed Silverboys and accepted payment from Silverboys for items not ordered or placed into production for many months following receipt of payment despite the fact that Silverboys was a "pay as you go" client; (iv) misappropriated credits, discounts, and referral fees; (v) failed to properly supervise and/or manage onsite construction and landscaping projects; (vi) failed to seek and obtain competitive bids for merchandise; (vii) failed to complete the work to the Project on time as represented or alternatively within a reasonable time.

364.     Silverboys fully complied with all material terms of the Interior Design Contract and Addendum thereto and has overpaid SOJO.

365.     Silverboys has suffered damages as a result of SOJO's multiple breaches of the Interior Design Contract and Addendum.

**WHEREFORE**, Silverboys requests judgment in its favor and against Defendant SOJO for its damages, together with interest, costs and such other relief as this Court deems just and appropriate.

## COUNT VII:  CONVERSION
### (Against SOJO Defendants)

366.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

367.    SOJO Defendants misappropriated and asserted dominion over Silverboys' property, including but not limited to Silverboys' funds, furniture, custom and/or non-custom goods, discounts, credits, and/or referral fees.

368.    Once Silverboys paid for items and services, regardless of whether or not actually received, they became the property of Silverboys.

369.    SOJO Defendants received large sums of money from Silverboys that was never applied to items purchased by Plaintiff and are presently unaccounted for.

370.    Further, Joelsson and SOJO intentionally ordered more goods and services than were necessary for the Project and then misappropriated the same for their own personal benefit or use in business projects that were unrelated to Silverboys.

371.    As alleged above, these actions (and others) and SOJO Defendants' continued retention of Silverboys' property is inconsistent with and adverse to Silverboys' ownership.

372.    SOJO Defendants do not have rightful possession of Silverboys' property.

373.    Silverboys has made demands to SOJO Defendants for the return of its property.

374.    As a direct and proximate result of the above-referenced acts, Silverboys suffered monetary damages in an amount to be determined at trial.

**WHEREFORE**, Silverboys demands judgment against SOJO Defendants for mandatory treble damages, pre-judgment interest, costs, attorney's fees, and for such other and further relief this Court deems just and proper.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

## COUNT VIII:  VIOLATION OF FLORIDA
## DECEPTIVE AND UNFAIR PRACTICES ACT
### (Against SOJO Defendants, Vendor Defendants, and Cudesso)

375.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

376.    This count is brought pursuant to Section 501.211(2), Fla. Stat.

377.    Under  that section, any "person who has suffered a loss as a result of a violation of [FDUTPA] . . . may recover actual damages, plus attorney's fees and court costs[.]"  Fla. Stat. § 501.211(2).

378.    At all times material, the Defendants conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

379.    Silverboys qualified and continue to qualify as "consumers" within the meaning of Section 501.203, Fla. Stat.

380.    The Defendants have engaged in deceptive, misleading, and/or unfair practices through the conduct alleged above.

381.    The misrepresentations, misleading statements, and concealment and omissions of material facts, alleged in the preceding paragraphs, occurred in connection with the Defendants' trade and commerce in Florida.

382.    The Defendants' unfair and deceptive acts and practices violate FDUTPA, Section 501.201 and 501.211(2), Fla. Stat.

383.    As a direct and proximate results of the Defendants' FDUTPA violations, Silverboys has been damaged an amount to be determined at trial.

**WHEREFORE**, Silverboys demands judgment in its favor and against SOJO Defendants, Vendor Defendants, and Cudesso for its actual damages, together with interest, costs, attorney's

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

fees pursuant to Fla. Stat. § 501.2105, and such other relief as this Court deems just and appropriate.

## COUNT IX:  SUCCESSOR LIABILITY
### (Against Successor Defendants and Cudesso)

384.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

385.    Successor Defendants acquired SOJO's assets.

386.    Defendant Joelsson Design continued SOJO's operations by employing its management, acquiring all, or nearly all, of its assets, provided the same products and services to Joelsson's clients, and operated from SOJO's previous location.  As a result, Defendant Joelsson Design is a mere continuation of SOJO.

387.    SOJO transferred substantially all of its assets to Successor Defendants and Cudesso.  As a result, Successor Defendants expressly or constructively assumed SOJO's liabilities.  Successor Defendants are successors-in-interest to SOJO and are jointly and severally liable with SOJO.

**WHEREFORE**, Silverboys demands judgment against Cudesso and Successor Defendants as successors-in-interest and severally liable with SOJO for damages, pre-judgment interest, costs, and for such other and further relief this Court deems just and proper.

## COUNT X:  ACCOUNTING
### (Against SOJO Defendants)

388.    Plaintiff repeats and re-alleges Paragraphs 1 through 320 above, as if fully set forth again herein.

389.    At all relevant times, SOJO was an agent and fiduciary of Silverboys.  As such, SOJO owed fiduciary duties to Silverboys, including the duty of loyalty, duty of care, duty of good faith, and duty of disclosure.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

390.    For reasons outlined above, SOJO breached its fiduciary duties by engaging in self-dealing or self-profiting, misappropriating funds and personal property, failing to properly supervise subcontractors and employees, and failing to disclose the details of SOJO's systemic overbilling, secret commissions, and fraud.  Further, SOJO created and provided deliberately confusing invoices, purchase orders, and cash requests to wrongfully extract additional funds from Silverboys without its knowledge and wrongfully appropriated for its own profit and benefit funds paid by Silverboys to be held in trust for the purpose of completing the Silverboys Project.

391.    To date, SOJO has been unable or unwilling to account for all of the items and funds that were entrusted to it as a fiduciary and agent of Silverboys.  Silverboys has no adequate remedy at law.

**WHEREFORE**, Silverboys demands an accounting of all Silverboys funds paid and all profits derived from SOJO from the Project and from SOJO's other misuse of Silverboys' funds and such further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Silverboys, LLC respectfully requests that the Court enter an Order granting the following relief:

(i)    An accounting of all Silverboys' funds paid and profits derived by the Defendants from the Project;

(ii)   Monetary damages in an amount to be determined at trial and all pre-judgment interest;

(iii)  Disgorgement of all profits and unjust gains;

(iv)   Punitive damages in an amount to be determined at trial;

(v)    Attorneys' fees and costs; and

(vi)   Such other and further relief as the interests of justice may require.

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: November 5, 2019                    Respectfully submitted,


                                           By: /s/Scott B. Cosgrove

                                           Scott B. Cosgrove
                                           Florida Bar No. 161365
                                           James R. Bryan
                                           Florida Bar No. 696862
                                           **León Cosgrove, LLP**
                                           255 Alhambra Circle, Suite 800
                                           Coral Gables, Florida 33133
                                           Telephone:  (305) 740-1975
                                           Facsimile:  (305) 437-8158
                                           Email:  scosgrove@leoncosgrove.com
                                           Email:  jbryan@leoncosgrove.com
                                           Email:  anoonan@leoncosgrove.com
                                           Email:  lburns@leoncosgrove.com

                                           *Counsel for Silverboys, LLC*

LEÓN COSGROVE, LLP
255 ALHAMBRA CIR.  |  SUITE 800  |  CORAL GABLES, FL 33134  |  T 305.740.1975  |  WWW.LEONCOSGROVE.COM